**UNITED STATES COURT OF  APPEALS**

**FOR THE FIFTH CIRCUIT**

NO. 97-20102
Summary Calendar

JIMMY W. BARBER

Plaintiff-Appellee

VERSUS

NABORS DRILLING U.S.A., INC.; NABORS LOFFLAND DRILLING COMPANY

Defendants

NABORS DRILLING U.S.A., INC.

Defendant-Appellant

Appeal from the United States District Court
For the Southern District of Texas

December 4, 1997

Before BENAVIDES, PARKER and DENNIS, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

**I.**

The opinion previously entered in this case is hereby withdrawn and replaced with the following.  This action was brought by Jimmy Barber of Taylorsville, Mississippi, against his former employer, Nabors Drilling, U.S.A., Inc. (hereinafter "Nabors"), a subsidiary of Nabors Industries of Houston, Texas, claiming a violation of the Americans with Disabilities Act (hereinafter "ADA").  42 U.S.C. § 12101, *et seq*.  Nabors refused to allow Barber

1

to return to his job as a toolpusher on an oil drilling rig after he received treatment for a back injury (bulging disc) suffered while on the job. Barber's doctor had refused to release him to do anything more than light duty work, but Barber maintained then and maintains now that he was capable of performing the essential functions of the toolpusher job in spite of his disability and the medical assessment thereof. The matter was tried before a jury in the United States District Court for the Southern District of Texas. The jury returned a verdict in favor of Plaintiff in the amount of $154,188.50 for back pay and benefits and $750,000.00 for punitive damages, and the district court entered judgment on the jury's verdict. On motion of Nabors, the district court reduced the punitive damages award to $300,000.00, consistent with the applicable damages cap. 42 U.S.C. § 1981a(b)(3). Nabors' contemporaneous motion for judgment as a matter of law, or, alternatively, for new trial was denied. The district court entered its modified judgment on January 7, 1997.[1]

Nabors brings this appeal aserting the following alleged errors:

1. Whether the District Court erred by entering judgment on the jury's verdict when the work limitations of Plaintiff, as established by his own doctors, would prevent him from performing the essential functions of his job;

2. Whether the District Court erred by refusing to give the Defendant-Appellant's requested jury instructions on what considerations to use when identifying the essential

---

[1]Final judgment was for $154,188.50 in back pay and benefits, plus $300,000.00 in punitive damages, plus $78,925.00 in attorneys fees and $5,430.35 in costs awarded over Defendant's objection.

functions of the job and the limits of an employer's duty of reasonable accomodation;

3.   Whether the judgment entered should be reformed to eliminate an award of punitive damages because of the lack of evidence that defendant acted with malice or reckless indifference.

## II.

On March 1, 1993, while working for Appellant's predecessor in interest, Grace Drilling, Plaintiff/Appellee, Jimmy Barber, injured his back moving a nitrogen tank in the course of his duties as a toolpusher on an oil drilling rig.  On June 1, 1993, Grace Drilling sold out to Appellant, Nabors Drilling, U.S.A., Inc.  On or about June 28, 1993, Barber informed his superior that he needed time off from work to seek treatment of his back injury.

After consulting several physicians, Barber was eventually referred to Dr. Kerry L. Bernard, a neurosurgeon in Hattiesburg, Mississippi, where he was evaluated with an eye toward possible surgery.  A bulging disc was confirmed at the L-4 and L-5 lumbar vertebrae, and, following a myelogram, Dr. Bernard counselled against surgery in favor of epidural steroid injections.[2]  The first injection was given by Dr. David McKellar and was successful in relieving Barber's pain.  Nearly a month later, on September 20, 1993, Dr. Bernard was impressed enough with Barber's improvement that he gave Barber a release to return to work on light duty.  After two weeks of light duty, Barber was to contact Dr. Bernard by

_____

[2]The injections were to be accompanied by occupational therapy at the Methodist Hospital Wellness Center in Hattiesburg, Mississippi, however, Barber's workers' compensation insurance carrier refused to pay for it and his enrollment was cancelled.

phone for a follow-up.  If Barber's condition remained good, Dr. Bernard would give him a release to work with only two restrictions: lifting no more than twenty-five pounds and climbing no more than fifteen feet.[3]  If Barber's condition remained good after three months on this restricted basis, Dr. Bernard would reassess him for the possibility of removing the restrictions.[4]

Immediately after receiving the light-duty release from Dr. Bernard, Barber attempted to contact Doug Blaire at Nabors' Tyler, Texas, office on 12 to 15 occasions about possibly returning to work, but was unable to reach him.  After approximately a month of trying, Barber contacted Billy Malone, operations manager at Nabors' New Braunfels, Texas, office.  Mr. Malone was going to talk to certain executives at Nabors about whether Barber could return to work and get back in touch with Barber.  After several more weeks of phone-tag, Barber was finally informed that he would not be allowed to return to work as a toolpusher without a "full medical release".  Mr. Barber explained that he could perform the functions of toolpusher just as he had in the period from March 1, 1993, when he was injured, until June 28, 1993, when he went for treatment.  Nevertheless, Nabors was steadfast in its position that

_____

[3]There is some conflict as to whether the climbing restriction was simply no climbing over fifteen feet or no unsecured climbing over fifteen feet.  In his direct testimony, Barber stated that Dr. Bernard was going to limit him to no unsecured climbing over fifteen feet.  However, Dr. Bernard's letter of September 20, 1993, to Dr. Bertha Blanchard, who referred Barber to Dr. Bernard, states that the limitation was to be simply a "15 feet climb restriction".

[4]Dr. Bernard did express some reservation about whether Barber would ever be able to lift up to one-hundred pounds, which, according to Barber, was included in his job description.

Barber could not return to work as a toolpusher without a "full medical release".

Since Barber was not allowed to return to work on light duty, he did not return to Dr. Bernard for his scheduled two-week reassessment. Meanwhile, four to six weeks after Barber's September steroid injection, the effect began to wear off and his symptoms returned just as intensely as before. Thereafter, starting on November 30, 1993, Dr. Bernard continued to treat Barber conservatively with epidural steroid injections. The successive injections provided no relief. After eliminating degenerative hip disease as a cause of Barber's pain, Dr. Bernard discussed with Barber the option of lumbar decompressive surgery.

Dr. Bernard discussed with Barber the risks and potential benefits of decompressive surgery. The risks include: bleeding requiring transfusion; infection; increased neurological deficit (weakness/paralysis, sensory loss, loss of bowel/bladder/sexual function); cerebral spinal fluid leak; spinal instability; and general anesthetic risks including death. On the other hand, Dr. Bernard concluded that Barber's chances of significant improvement following the surgery were considerably less than the eighty-five percent (85%) chance quoted to most patients undergoing this type of operation. Dr. Bernard explained to Barber that he should consider surgery only if he was completely unsatisfied with his current situation and could not live with his pain.

Dr. Bernard also discussed vocational rehabilitation concerning various job options, but concluded that whether or not

Barber wished to pursue those job options was between Barber and his insurance carrier. In addition, Dr. Bernard explained that he would not release Barber to work except on light duty status, unless Barber completed a work conditioning program to his satisfaction.[5] Barber returned to Dr. Bernard on several occasions for reassessment from February 28 to December 29, 1994. On each occasion he presented with the same symptoms. At least once during this period Dr. Bernard again discussed with Barber the possibility of surgery.[6]

Barber was unable to find employment from September, 1993 until July, 1995, at which time he started his own business. During that period, Barber testified that his doctor (the record does not reveal which doctor) vetoed his attempts to work as an insurance salesman who needed to drive frequently and as a truck driver. Barber testifed that he has been unable to do almost every job for which he is qualified, which the rehabilitation people suggested to him, because of the medical assessment of his disability. Since Barber had not elected to have decompressive surgery and had not completed a work conditioning program, the medical assessment of Barber's disability, as of the time of trial, was that he was not fit to perform anything more than light duty

---

[5]Barber testified on cross-examination that he never had the surgery, and never underwent work hardening or conditioning.

[6]On June 22, 1994, after concluding that, short of a major decompressive operation, there was nothing to offer Barber to potentially relieve his lower back and lower extremity complaints, Dr. Bernard discussed the option of decompressive surgery with Barber for the third time.

work.

**III.**

**A.**

Under Title I of the ADA, no covered employer may discriminate against "a qualified individual with a disability because of the disability of such individual" in any of the "terms, conditions [or] privileges of employment," 42 U.S.C. § 12112 (a). In addition, the ADA imposes upon the employer the duty to provide reasonable accomodations for known disabilities unless doing so would result in undue hardship to the employer. 42 U.S.C. § 12112 (b)(5)(A). To establish a *prima facie* violation of the ADA Barber had to prove: 1) that he had a disability; 2) that he was otherwise qualified for the job of toolpusher, and; 3) that Nabors refused to hire him back because of his disability. Robinson v. Global Marine Drilling Co., 101 F.3d 35, 36 (5th Cir. 1996). In order to determine whether Barber was otherwise qualified to be a toolpusher, the jury must have concluded that he could perform the essential functions of the job, either with or without reasonable accomodation. 42 U.S.C. § 12111(8); Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 162 (5th Cir. 1996). The determination of whether Barber was otherwise qualified depends on the resolution of two corollary questions: 1) what are the essential functions of the toolpusher's job, and; 2) are the proposed accomodations, if any, reasonable? The second corollary question would be irrelevant if the jury found that Barber could perform the essential functions of the toolpusher job even without reasonable accomodation.

7

There is no controversy on this appeal about whether Barber was disabled within the meaning of the ADA or whether Nabors refused to hire him back because of his disability. The controversy on this appeal centers around whether there was sufficient evidence for the jury to conclude that Barber was otherwise qualified to do the job of toolpusher, whether the jury was adequately instructed to make that determination and whether the evidence supported an award of punitive damages.

**B.**

**Whether the District Court erred by entering judgment on the jury's verdict when the work limitations of Plaintiff, as established by his own doctors, would prevent him from performing the essential functions of his job.**

Appellant argues that reasonable jurors could not have concluded that Barber was a "qualified individual with a disabilility" as required to make out a prima facie case under the ADA, because Barber was not capable of performing the essential functions of the toolpusher position either with or without reasonable accomodation. Appellant describes several functions which are supposedly essential and which Barber cannot perform, to wit:

1) Filling in for other crewmembers, namely the driller, especially on a horizontal or directional well;

2) Retrieving equipment and replacement parts needed to keep the rig running from a stacked rig or elsewhere at the equipment yard;

3) Responding to a fire on the rig, because of the weight of the fire extinguishers;

4) Strapping on and wearing an oxygen tank, gas mask and

breathing apparatus, if sensors indicate the presence of poisonous gases on an H2S well.[7]  Appellant maintains that these functions are essential to the toolpusher position and that Barber cannot perform them, as indicated by the medical assessment of his capabilities.

First, we cannot say, on the facts of this case, that any or all of the above listed emergency duties as a matter of law are essential functions of the toolpusher job.  If we venture to second-guess then we simply usurp the most critical function of the jury in ADA cases, i.e., the injection of some indispensable common sense in the determination of what is or is not an essential function.  When a statutory scheme such as the ADA necessitates some seemingly arbitrary line-drawing exercise, courts of law do well to refer the question to the jury, and consequently the appellate court must respect the jury's call, unless it is unsupportable by the evidence. Harrington v. Harris, 118 F.3d 359, 367 (5th Cir. 1997)(citing Fed.R.Civ.P. 50(a)(1) (jury's verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did).

A highly deferential standard is especially appropriate with regard to the jury's determination of what the essential functions of the job are, since the evidence, as in this case, most often consists of *post hoc* descriptions of what the employee was expected to do and what he actually did, which necessarily requires the jury

---

[7]An H2S well is a well where there is the possibility that Hydrogen Sulfite, a poisonous gas, will be released by the drilling process.

to judge the credibililty of witnesses and the veracity of their testimony.  In as much as the jury's verdict in this case rests on the conclusion that the above listed emergency functions are marginal rather than essential, there is no error.  Even though we might disagree with the jury's conclusion, that is not the standard, and on this record the jury's determination was supported by a legally sufficient evidentiary basis.

The jury's determination that Barber was otherwise qualified for the toolpusher job might also rest on the conclusion that he could in fact perform the above listed emergency functions.  That conclusion would be problematic in light of the medical evidence relating to Barber's physical capabilities at the time he sought to return to work.  However, it is at least as likely that the jury's verdict was based on a determination that the essential functions of the toolpusher job were the physically benign supervisory functions described by Barber.  Therefore, any possible error is avoided.

## C.

**Whether the District Court erred by refusing to instruct the jury on what considerations to use when identifying the essential functions of the job and when determining the limits of an employer's duty of reasonable accomodation.**

This court has previously articulated the standard of review for challenges to the district court's jury instructions as follows:

> First, the challenges must demonstrate that the charge as a whole creates "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." Second, even if the jury instructions were erroneous, we will not reverse if we determine,

> based upon the entire record, that the challenged instruction could not have affected the outcome of the case.  If the party wishes to complain on appeal of the district court's refusal to give the proffered instruction, that party must show as a threshold matter that the proposed instruction correctly stated the law.

Flores v. Cameron County, Tex., 92 F.3d 258, 262 (5th Cir. 1996)(quoting Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1216 (5th Cir. 1995)).  See also F.D.I.C. v. Mijalis, 15 F.3d 1314, 1318 (5th Cir. 1994).

### *i.*

In order to determine that Barber was otherwise qualified to be a toolpusher, the Jury must have concluded that he could perform the essential functions of the job, either with or without reasonable accomodation.  42 U.S.C. § 12111(8); Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 162 (5th Cir. 1996).  On the issue of the essential functions of Barber's job, the relevant portions of Jury Instruction No.3 are as follows:

> The phrase "essential functions" of an employment position means the basic, fundamental duties of the job the person with a disability holds or desires.  Essential functions do not include the marginal functions of the position.  A job function may be considered essential for any of several reasons, including but not limited to the following:
> (1)  because the reason the position exists is to perform that function,
> (2)  because of the limited number of employees available among whom the performance of that job function can be distributed, and/or,
> (3)  because the function may be highly specialized so that a person is hired for his expertise or ability to perform that particular function.
>
> In determining whether a particular function is essential, you may consider:
> (1)  the employer's judgment as to which functions are essential,
> (2)  written job descriptions prepared before advertising

or interviewing applicants for the job,
(3) the amount of time spent on the job perfoming the function,
(4) the consequences of not requiring the employee to perform the function,
(5) the work experience of past incumbents in the job, and/or
(6) the current work experience of persons with similar jobs.

This charge was taken almost verbatim from the E.E.O.C.'s regulations/guidelines. 29 C.F.R. § 1630.2(n). The district court then denied the Appellant's request to instruct the jury that:

> [w]ith respect to item (4) above, the EEOC's Technical Assistance Manual offers the example of a firefighter who, because of physical impairment, is incapable of carrying an unconscious person from a burning building. The firefighter may be called upon to perform this task only rarely, but the consequences of being unable to do it when necessary are sufficient to make it an essential function of the firefighter's job.

There was considerable testimony that, in the event of some unforeseen contigency, Barber might be called on to fill in for other crewmembers, retrieve heavy parts and equipment, handle and manipulate heavy safety and emergency equipment, and even to scale the one-hundred and forty-two (142) foot derrick. Barber himself testified that he had previously filled in for the driller, gone to pick up heavy replacement parts and other equipment, and worn the heavy protective breathing apparatus for poisonous gas releases on an H2S well. However, due to the infrequency with which Barber would be called on to perform these "emergency functions", Nabors naturally feared that the jury might consider those functions "marginal" rather than "essential". As it turns out, that fear was justified, since Barber's counsel made that very argument in his closing.

The point of the requested instruction was to make sure the jury understood that, even though the performance of these functions might be rare, the consequences of their non-performance could be so catastrophic as to make those functions "essential". However, that very point was made clear enough by the instructions given and further illuminated by Nabors' closing argument.[8]

The jury was instructed that it might consider the consequences of non-performance as bearing on whether that function was essential. Nabors, in closing arguments, highlighted the evidence presented indicating that an oil drilling rig is a dangerous place and that, in an emergency, the inability of Barber to perform might have disastrous consequences for other crewmembers, the company and even Barber himself. However, the fact that the jury considered that possibility too remote to make these "emergency functions" essential does not lead to the conclusion that the jury must have been inadequately instructed.

Even if the jury had been instructed as Appellant requested, that would not have necessitated a verdict in Nabors' favor. The jury, nevertheless, could have found for Plaintiff, if they believed that the duties of a fireman and those of an oil rig

---

[8]In closing arguments, Nabors Drilling made the following argument to the jury:

> We know what Mr. Barber's restrictions are. We know what his doctor says he can and can't do. And we also know . . . that fire extinguishers on the Rig 204 weigh over 50 pounds. That is more than double what he is allowed to lift. Now, is the employer supposed to say, okay, well, you can come back even though we know you can't handle this kind of emergency if it comes up. And the fact that it may come up only rarely doesn't dimish how essential it is for him to be able to respond to it.

toolpusher are sufficiently different so that these "emergency functions", which Barber might or might not be called upon to perform, are not essential functions of his job.

### ii.

The district court instructed the jury on the issue of reasonable accomodation that:

> [a] reasonable accomodation is defined by the ADA as the modification or adjustments to the work environment, or to the manner of circumstances under which the position held is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position.

The district court refused to instruct the jury as follows:

> You are further instructed that the Americans with Disabilities Act does not require an employee [sic] to provide "light duty" or any other "accomodation" that would result in other employees having to work harder or longer hours or that would transfer from the disabled employee any of the essential functions of his job.

The Appellant argues that the refusal to give this instruction allowed the jury to conclude that reassignment of certain of Plaintiff's essential functions to other employees would have been a reasonable accomodation.

It is true that the law does not require an employer to tranfer from the disabled employee any of the essential functions of his job. If it is necessary to transfer any of the essential functions of the toolpusher job to others on the rig, then Barber is not otherwise qualified. We cannot say that he can perform the essential functions of the job with reasonable accomodation, if the only successful accomodation is for Barber not to perform those essential functions. For that reason, this not an accomodation

**14**

case.

The only accomodation proposed by Barber was task reassignment, namely reassignment of the four emergency tasks outlined by Nabors. If the jury determined that any one of those functions was essential, then reassignment of that function would no longer be an accomodation option. On the other hand, if the jury determined that those emergency functions were not essential, then accomodation would not be necessary, because Barber would not have to perform them in order to be otherwise qualified.

Therefore, it was error to instruct the jury on reasonable accomodation at all, because: 1) the task reassignment option would not be a reasonable accomodation if these emergency functions were essential; and 2) if those emergency functions are not essential, then Barber is otherwise qualified whether he performed those functions or not, and the question of reasonableness of task reassignment as an accomodation becomes moot. However, the error in giving this instruction is of no import. Since it is at least as likely that the jury found these emergency functions to be marginal rather than essential, whether their reassignment to others was a reasonable accomodation is a moot question, upon which the jury's verdict does not depend.

**D.**

**Whether the judgment entered should be reformed to eliminate an award of punitive damages because of the lack of evidence that defendant acted with malice or reckless indifference.**

Barber's contention that this error was not adequately preserved for appeal is of no avail. Nabors did not object to the

submission of a punitive damages instruction to the jury. Furthermore, Nabors did not urge the insufficiency of the evidence as grounds for judgment against Barber on the issue of punitive damages at the close of Barber's case under Rule 50(a) or at the close of all the evidence under Rule 50(b). In part the purpose of Rule 50 is to "alert the opposing party to the insufficiency before the case is submitted to the jury, thereby affording it an oportunity to cure any defects in proof should the motion have merit." Satcher v. Honda Motor Co., 52 F.3d 1311, 1315 (5th Cir. 1995), quoting Bohrer v. Hanes Corp., 715 F.2d 213, 216 (5th Cir. 1983), cert. denied, 465 U.S. 1026, 104 S. Ct. 1284, 79 L. Ed. 2d 687 (1984). However, failure to object to the jury instruction and non-compliance with Rule 50 need not be fatal. Errors raised for the first time on appeal may be reviewed for plain error. Matter of Hudson, 107 F.3d 355, 357 (5th Cir. 1997); Brown v. Bryan County, Okl., 67 F.3d 1174, 1182 (5th Cir. 1995); Stokes v. Delcambre, 710 F.2d 1120, 1128 (5th Cir. 1983). "This court may correct a plain error only if it seriously affected the 'fairness, integrity, or public reputation' of the judicial proceedings." Matter of Hudson, 107 F.3d at 357 (quoting United States v. Calverly, 37 F.3d 160, 164 (5th Cir. 1994) (en banc), cert. denied, 513 U.S. 1196, 115 S. Ct. 1266, 131 L. Ed. 2d 145 (1995)). This court has stated that "[f]ailure to object to the jury charge in the trial court precludes review on appeal unless the error is so fundamental as to result in a miscarriage of justice." Farrar v. Cain, 756 F.2d 1148, 1150 (5th Cir. 1985) (citing Whiting v. Jackson State Univ., 616

**16**

F.2d 116, 126 (5th Cir. 1980).

It was plain error for the district court to allow the question of punitive damages to go to the jury.  Under the Civil Rights Act of 1991, punitive damages may be awarded in cases of intentional employment discrimination, "if the complaining party demonstrates that the respondent [employer] engaged in a discriminatory practice ... with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

The record in the instant case is simply devoid of evidence that Nabors acted maliciously or with reckless indifference for Barber's rights under the ADA.  It is true that Nabors refused to allow Barber to return to work without a "full medical release".  However, the evidence adduced at trial demonstrated a good faith dispute as to whether a "full medical release" would be necessary for Barber to perform the essential functions of the toolpusher job.  Therefore, Nabors insistence on a "full medical release" before Barber could return to work cannot form the basis for a conclusion that Nabors acted with malice or reckless indifference. Furthermore, there can be no question that any error that costs a party $300,000.00 dollars is "so fundamental as to result in a miscarriage of justice".  Therefore, the award of punitive damages must be reversed.

## IV.

There is no reversible error in the charge to the jury, and the jury's verdict is supported by the evidence.  However, it was

**17**

plain error to submit the question of punitive damages to the jury. Therefore, we reduce the award of punitive damages to zero and affirm the judgment in all other respects.

AFFIRMED in part, and REVERSED and RENDERED in part.