**Betty PATE**

v.

**BAKER TANKS GULF SOUTH, INC., Baker Tanks, Inc. and Derrell Miller.**

No. CIV. A. 97–0345.

United States District Court, W.D. Louisiana, Lake Charles Division.

Jan. 20, 1999.

4. Both courthouses are located on St. Louis Street in Baton Rouge—one on the east side of the street, the other on the west.

Sidney J. Rosteet, Lake Charles, LA, for plaintiff.

Robert K. McCalla, New Orleans, LA, for defendant.

*MEMORANDUM OPINION*

EDWIN F. HUNTER, Senior District Judge.

On December 10, 1998, the above-captioned case came on for bench trial before the undersigned. After delays for briefing, we proceed to enter findings of fact and conclusions of law:

*Background*

On March 31, 1995, Betty Pate received a certified letter from her employer, Baker Tanks, Inc., formerly known as Baker Tanks Gulf South, Inc., notifying her that she had been discharged from employment. At the time of her discharge, Pate was a 57–year old, white female, with diabetes.

Pate firmly believed that her dismissal was based on her diabetes-caused disability and her age. On May 10, 1995, Pate wrote a letter to the Equal Employment Opportunity Commission stating that she believed her former employer had discriminated against her on the basis of her disability and age. Pl. Exh. 3, in globo. On September 18, 1995, the EEOC mailed Pate a Charge of Discrimination which had been drafted from her correspondence. *Id.* On October 9, 1995, Pate signed and returned the Charge of Discrimination. *Id.* On October 24, 1996, the EEOC issued Pate her Notice of Right to Sue. *Id.*

On January 21, 1997, Pate filed the instant suit in the 14th Judicial District Court for the Parish of Calcasieu, State of Louisiana. Made defendants were Baker Tanks, Inc., formerly known as Baker Tanks Gulf South, Inc. ("Baker"), and her former supervisor, Derrell Miller. *See,* Petition. Pate's suit alleged that defendants violated provisions of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621; and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* Pate sought damages for back pay, emotional distress, humiliation, future lost wages and benefits, plus attorney's fees. Plaintiff also sought injunctive relief requiring Baker to restore her to her former position. Petition, ¶ 31.

On February 20, 1997, defendants timely removed the action to federal court under 28 U.S.C. § 1441(b), on the basis of federal question jurisdiction, 28 U.S.C. § 1331. On November 19, 1997, Derrell Miller filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(c). *See,* Doc. # 13. Plaintiff did not contest the motion to dismiss, and on December 11, 1997, the motion was granted and judgment signed. *See,* December 11, 1997, Memorandum Ruling and Judgment.

After further discovery, Baker filed a motion for summary judgment on July 8, 1998. *See,* Doc. # 27. On August 24, 1998, plaintiff filed her opposition to defendant's motion for summary judgment. *See,* Doc. # 31. On October 8, 1998, Baker's motion for summary judgment was denied. *See,* October 8, 1998, Memorandum Ruling. On December 10, 1998, the case was tried in a one day bench trial. After delay for briefing, the matter is now before court for decision.

*FINDINGS OF FACT*

1.

In May, 1994, Pate applied for the Administrative/Dispatch position at Baker's Sulphur facility. During Betty Pate's pre-employment interview with Baker for the position, she volunteered to Derrell Miller, the branch manager, that she had diabetes and was taking daily injections.

2.

Derrell Miller hired Betty Pate as the Administrative/Dispatch clerical employee on June 24, 1995.

3.

Ms. Pate worked as the Administrate/Dispatch employee at Baker's Sulphur office. The Company leased large tanks and roll off containers used to haul liquids and solids to customers.

4.

When a customer wanted to lease a container, the customer would call Pate who would determine availability of the container

and arrange for delivery of the container to the customer.

5.

Plaintiff's job duties included inspecting containers when they were returned to Baker, maintaining records concerning the inventory of tanks and containers, preparing and processing the lease agreements, billing the customers, and other related duties.

6.

According to Ms. Pate, "It was a one girl office." Pate was the only employee on the Administrative/Dispatch job. Pate was often the only person at the terminal for extended periods of time. It was essential to have someone assigned to that position at all times.

7.

Miller testified that Pate was qualified for the job, a good employee and that he had no problem with her work performance. Pate described her relationship with Miller during the nine months she worked as, "very good." Pate testified that Miller never treated her badly. She had nothing but praise for him.

8.

On Friday, February 17, 1995, Pate received permission from Miller to leave work early for a doctor's appointment for an infected toe. That same afternoon, Pate was admitted to the hospital. The next day, doctors surgically removed her toe. She remained in the hospital for seven (7) days.

9.

Upon her first release from the hospital, Pate contacted Derrell Miller on February 24, 1995, and told him that she was ready to return to work in a wheelchair. Miller told her that the company required a complete release from her doctor and the company doctor before she could come back to work. At this juncture, Pate had not been released by her doctor to return to work.

10.

Subsequent to her February 23–24 discharge from the hospital, Ms. Pate developed cellulitis. She was re-admitted to the hospital from March 5–8, 1995. During her recovery period, Pate attended physical therapy sessions, twice per week for one hour.

11.

In a March 23, 1995, letter, plaintiff's physician, Dr. Kevin Schlamp detailed Betty Pate's treatment from February 17, 1995, through a March 20, 1995 examination. Pl. Exh. 5. Dr. Schlamp opined that Pate could return to work, "by March 27 +/a few days." *Id.* A facsimile of Dr. Schlamp's letter was sent to Baker on March 27, 1995.[1] Plaintiff's surgeon, Dr. Kent Seale, gave Pate a return to work slip with no restrictions effective March 26, 1995. Pl. Exh. 6. We find that Pate was not released by her doctors to return to work until March 26, 1995.[2]

12.

During Ms. Pate's absence, Derrell Miller had to find a temporary replacement. Betty Pate acknowledged that someone had to be in the office. The three other employees at the Sulphur facility had other duties such as driving and maintenance. Their work requirements took them away from the facility at least 75 percent of the time. Miller's job duties took him away from the office around 50 percent of the time.

13.

During Ms. Pate's absence, Miller first turned to his wife, Rhonda, to cover for her. Rhonda Miller had substituted in the past, and was familiar with the work. Miller's wife was competent and qualified, but was not as knowledgeable about technical matters as Ms. Pate. Rhonda Miller filled in for about two weeks, but then the Company told Miller that his wife could not continue to substitute due to the firm's anti-nepotism policy. At this point, Miller resorted to an agency that provided temporary personnel. The first

---

1. A copy of Dr. Schlamp's letter with the facsimile date and time stamp was produced from Baker's personnel files.

2. In her deposition, and at trial, Pate asserted that she had permission from Dr. Schlamp to return to work after her first release from hospital on, or about February 24, 1995. The written exhibits and Dr. Schlamp's testimony do not support plaintiff's assertion.

temporary did not work out well at all. The second temporary was a little better, but was still oblivious to the policies and procedures of the position.

14.

Due to the temporaries' inability to answer questions and problems, customers were becoming frustrated. The temporaries were unable to complete necessary paperwork, and the corporate office was upset. The branch was losing business.

15.

According to Miller, Pate could not tell him when she would receive permission from her doctor to return to work. Miller notified Baker's Director of Human Resources, Terry Ginsburg, that they needed someone in Ms. Pate's position. Ginsburg told Miller to hire someone else. During the week of March 24, 1995, Miller hired Cathy Morrow, a female in her 30s.

16.

On, or about March 27, 1995, Pate notified Miller that she had received permission from her doctor to return to work. However, Miller informed her that she had been replaced the week before. In a March 31, 1995, letter, Terry Ginsburg formally advised Pate that she had been replaced. Pl. Exh. 2.

17.

At the time Derrell Miller decided to hire a replacement for Ms. Pate, he did not know when she would be able to return to work. Miller did not contact Ms. Pate's doctors, despite authority to do so. He felt that Ms. Pate was in the best position to keep him informed of her progress and prognosis. In a February 25, 1995, conversation, Miller asked Pate when her diabetes condition would be cured. She responded that diabetes is brought under control, but is never cured.

18.

Baker had a five days per year sick leave policy. Baker also provided five days paid vacation per year. There was no evidence that any other Baker employee had missed

four to five weeks, and still retained his position upon return.

19.

At the time of her discharge, Ms. Pate was earning $ 300 per week. After her discharge from Baker, she remained unemployed for about one year until April 19, 1996. During this period, Pate enrolled in computer classes under the Job Partner Training Act. In April, 1996, she secured employment at Summit Hospital in Sulphur, Louisiana where she earns $ 7.03 per hour. She remains employed at Summit, and is considered an "institution" there.[3]

20.

Betty Pate suffers from Type II Diabetes. It is moderately severe and requires daily insulin shots. Without daily medication, Pate's blood sugar level would be extremely high, and would result in bilateral kidney failure, heart and hearing problems, and loss of a limb(s). With daily medication, Pate experienced vertigo, diminished eye sight and inability to maneuver in her washroom. However, Pate admitted at trial that with medication, she had no great lifestyle impairment.

21.

Pate was unable to attend work from February 18, 1995, through March 26, 1995, due to diabetes-related complications.

22.

Regular attendance at work, without excessive absence, was an essential function of the administrative/dispatch position at Baker's Sulphur Branch.

23.

Pate was replaced due to her extended absence. Her replacement had/has no disability.

24.

Baker's company policy was that if an employee was absent due to illness for more than five days, then he/she needed a physical examination before returning to work. The reason that Baker required a return to work

---

**3.** A finding which we fully support, as Ms. Pate appeared extremely competent and well-qualified at trial.

slip and physical examination was so that the employee would not hurt herself, or further injure herself by returning to work too soon.

25.

Plaintiff conceded that no evidence of age discrimination was presented at trial.

26.

We find that Ms. Pate's discharge from employment was not motivated by disability discrimination.

27.

Insofar as these findings of fact also constitute conclusions of law, they are adopted as such.

## CONCLUSIONS OF LAW

1.

Federal subject matter jurisdiction arises under 28 U.S.C. § 1391. Venue is proper in the Western District of Louisiana. 28 U.S.C. § 1391.

2.

The ADA provides that, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

3.

To establish a claim under the ADA, a plaintiff must demonstrate that:

(1) she is *disabled* within the meaning of the ADA;

(2) she is *qualified* for the job; and

(3) an adverse employment decision was made solely due to her disability.

*Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 763 (5th Cir.1996).

4.

■ Diabetes must be considered in its unmitigated state when determining whether it constitutes a disability under the ADA. *Washington v. HCA Health Services*, 152 F.3d 464 (5th Cir.1998). Disability is defined as,

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102.

5.

■ Pate's *unmedicated* Type II diabetes affected one or more of life's major activities and is a disability as contemplated in the ADA. Pate's Type II diabetes in its *medicated* condition did not affect a major life activity, and is not a disability under the ADA.

6.

A "qualified individual with a disability," is an, "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

7.

■ An employee who has not been released by her doctor to return to work is not qualified to perform the essential functions of the job. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir.1998).

8.

A "reasonable accommodation" is defined as: making existing facilities readily accessible and usable by employees with disabilities; job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modification of equipment or devices; appropriate adjustment or modifications of examinations, training materials or policies; and/or providing qualified readers or interpreters. 42 U.S.C. § 12111(9). A defendant can be relieved from the requirement of providing a reasonable accommodation if it can demonstrate that the proposed accommodation would impose an undue hardship on the operation of the business. 42 U.S.C. § 12112(b)(5)(A).

9.

The term "undue hardship" is defined as an action requiring significant difficulty or expense. 42 U.S.C. § 12111(10)(A). In determining whether an accommodation would impose an undue hardship on an employer, the following factors are to be considered,

(I) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10)(B).

10.

Regular attendance is an essential function of most jobs. *Hypes o/b/o Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998).

11.

■ The law does not require an employer to transfer from the disabled employee any of the essential functions of the job. *Barber v. Nabors Drilling, U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir.1997). An employee cannot perform the essential functions of a job with reasonable accommodation, if the only successful accommodation is for the employee not to perform those essential functions. *Id.* An accommodation which requires other employees to work harder or longer is not required under the ADA. *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir.1996).

4. Necessary paperwork and· customer support

12.

■ "[R]easonable accommodation does not require [an employer] to wait indefinitely for [the employee's] medical conditions to be corrected. . . . " *Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 759–760 (5th Cir.1996)(*quoting, Myers v. Hose*, 50 F.3d 278, 283 (4th Cir.1995))(emphasis in original).

13.

In our previous memorandum ruling, plaintiff presented evidence that she had received a release to return to work from her doctor by February 24, 1995. However, we then noted that if Pate had been incapable of returning to work for the entire length of her recuperation, a different end result might obtain. *See,* October 8, 1998, Memorandum Ruling, fn. 8. Of course, at trial, we found that plaintiff was not released to return to work until March 26, 1995—five weeks after she first left work. Thus, we are not presented with the situation contemplated in our previous ruling, (i .e. an employee who has been released by her doctor to return to work with restrictions which need accommodation).

14.

■ As previously found, one of the essential functions of the administrative/dispatch position was regularly being present at the Sulphur office. A consecutive five week absence does not constitute regular attendance. Without reasonable accommodation, Ms. Pate would not have been able to perform all of the essential functions of the administrative/dispatch job. For the first three weeks, Baker attempted to accommodate Ms. Pate by having temporary help perform her duties. However, the ADA does not require an employer to transfer a disabled employee's duties to another. *Barber, supra.* Even with an accommodation consisting of temporary help, the essential functions of Ms. Pate's job were still not being accomplished.[4] No other reasonable accommodation was identified or suggested by plaintiff.

were not being adequately performed.

**15.**

Because the essential functions of Ms. Pate's position were not being performed with or without reasonable accommodation, she was not a qualified individual under the ADA. Alternatively, if the reasonable accommodation was for Baker to simply suffer through inadequate temporary substitute(s), this practice exacted an undue hardship upon defendant. Customers were becoming frustrated with the lack of knowledgeable support from office staff. The situation was adversely affecting the branch's operations and business. Indeed, the undue hardship on small companies imposed by extended absences is exemplified in the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* The FMLA accords 12 workweeks of leave during a 12–month period to an employee who suffers from a serious health condition which prevents her from performing the functions of her position. 29 U.S.C. § 2612. However, recognizing the onerous burden on smaller employers, the FMLA exempts employers which have less than 50 employees within 75 miles of the affected facility. 29 U.S.C. § 2611(2)(B). If Baker had employed the requisite minimum number of employees, there is no question but that Ms. Pate's condition would have been covered under the FMLA, and concomitantly, Baker would have been in a better position to accommodate Ms. Pate. Unable to invoke the FMLA, Pate's only alternative was the ADA. Yet, the ADA falls short under the instant facts.

**16.**

Defendant contends that instead of applying a reasonable accommodation analysis, this case should be analyzed to determine whether Baker intentionally discriminated against Ms. Pate because of her disability. *See, Burch v. Coca–Cola Co.,* 119 F.3d 305, 319 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998). In an intentional discrimination claim, we apply a subjective inquiry to determine whether an employer's true reasons for the employee's dismissal were discriminatory. *Id.* Here, the evidence establishes that Derrell Miller did not know when Ms. Pate would be able to return at the time he rec-ommended that she be replaced. On, or about March 27, 1995, when Pate notified Miller that she was able to return to work, a replacement had already been hired, and was undergoing training. The die had been cast. Baker's dire need to have someone knowledgeable and competent in Ms. Pate's position was the motivating factor in her replacement. We find no intent by Baker to discriminate against Ms. Pate due to her disability.

**17.**

Without any evidence of age discrimination having been presented, plaintiff did not establish that she was discharged in violation of the ADEA.

**18.**

We have reached today's result after much reflection and due deliberation. It is not an easy decision either way. Both Ms. Pate and Mr. Miller presented their accounts with great sincerity and conviction. Yet, we remain mindful that federal anti-discrimination statutes are not vehicles for judicial second-guessing of employment decisions, nor open invitations for courts to become personnel managers. *See, Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1507–1508 (5th Cir.1988). Our power granted under the ADA and similar statutes must be carefully exercised to uphold the constitutional rights of employees without trammeling the ability of private employers to sustain an independent and successful enterprise. Here, the constant fluctuation of balance favors the employer.

**19.**

Insofar as these conclusions of law also constitute findings of fact, they are adopted as such.

### JUDGMENT

In accordance with today's memorandum opinion,

IT IS ORDERED, ADJUDGED, and DECREED that plaintiff, BETTY PATE, take

nothing, and that the action be dismissed on the merits, with prejudice, at plaintiff's cost.