

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-24-00034-CV

VERONICA BRATU, APPELLANT

V.

TEXAS DEPARTMENT OF MOTOR VEHICLES, APPELLEE

On Appeal from the 48th District Court
Tarrant County, Texas
Trial Court No. 048-328940-21, Honorable Christopher Taylor, Presiding

June 28, 2024

MEMORANDUM OPINION[1]

Before QUINN, C. J., and PARKER and DOSS, JJ.

After being hired by the Texas Department of Motor Vehicles (department) to work with computers and answer phones, suffering injury in November 2017, experiencing various accommodations for her injuries over the ensuing 16 months, and her doctor ultimately restricting her from using a keyboard in toto and phones for more than a de minimis period of time, Veronica Bratu was discharged. That resulted in her claiming

---

[1] Because this appeal was transferred from the Second Court of Appeals, we apply its precedent should it conflict with that of the Seventh Court of Appeals. TEX. R. APP. P. 41.3.

discrimination based on age and nationality, retaliation, and failure to accommodate. In response to her suit, the department filed its plea to the jurisdiction of the trial court, which plea the court granted. Thus, the action was dismissed with prejudice. Before us is her appeal. Through one issue with numerous subparts, she contends sufficient evidence raised questions of fact regarding each element of her various causes of action. That, in her estimation, meant the trial court erred in granting the department's plea to the jurisdiction. We affirm.

### *Background*

Bratu, a Romanian woman in her fifties, worked for the department's Fort Worth Regional Service Center for a decade and until her discharge on April 30, 2019. Jeremiah Kuntz, the Director of the Vehicle Title and Registration Division, made the decision to end her employment. His reason "was based on Ms. Bratu's exhaustion of all available leave and her inability to return to work and perform her essential job duties, even with accommodations."

In November 2017, Bratu sustained a work-related injury resulting in visits to physicians and physical therapy. As of October 2018, the medical restrictions by which she had to abide precluded her from working more than 24 hours per week. So too was she required to attend physical therapy twice a week with each visit lasting eight hours. The department accommodated those and her earlier restrictions.

In December 2018, Bratu went on leave per the Family and Medical Leave Act (FMLA), which leave was depleted by February 2019. Yet, when allowed to return on February 4, 2019, with additional restriction imposed by her doctors, she left the following day. Apparently, while at her desk, she experienced extreme pain. That led to a

2

supervisor (Wilson) driving her to the emergency room. From then until her termination on April 30, 2019, Bratu never returned for work. This was so despite being released by her doctors to return as of April 15, 2019, and April 23, 2019. Discussion began among the department and Kuntz about Bratu's continued employment and its receipt of Bratu's latest medical release. Through it, her physicians barred her from "using the keyboard or answering the phones for more than 1-5% of the day."

Bratu was notified of the department's discussions and its consideration of ending her employment. She responded and suggested that she be accommodated by allowing her to process salvage titles and work at the information desk. Kuntz ultimately decided to release Bratu for the reasons stated earlier.

### Standard of Review

The standard of review is settled and needs little explanation here. We refer the parties to discussion in *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506 (Tex. 2019), *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 770-71 (Tex. 2018), *Hous. Belt & Terminal Ry. Co. v. City of Hous.*, 487 S.W.3d 154 (Tex. 2016), and *Tex. Dep't of State Health Servs. v. Kerr*, 643 S.W.3d 719 (Tex. App.—Amarillo 2022, no pet.).

### Disability Claim or Failure to Accommodate

To establish a prima facie case of disability discrimination, a plaintiff must show that 1) she has a "disability"; 2) she is "qualified" for the job; and 3) she suffered an adverse employment decision because of the disability. *Davis v. City of Grapevine*, 188

3

S.W.3d 748, 757 (Tex. App.—Fort Worth 2006, pet denied).[2]  In other words, one claiming an employer failed to provide reasonable accommodations, or otherwise discriminated against her based upon a disability, must show that:  1) with reasonable accommodations she could perform the essential functions of the position and 2) the employer refused to make such accommodations.  *Id.* at 758.  Below, the department argued that Bratu was not a qualified individual with a disability because her condition at the time of her separation from employment was such that she could not perform the essential functions of her job, even with reasonable accommodations.

Evidence provided the trial court illustrated:  1) she suffered from an injury; 2) it impeded her ability to work; 3) accommodations were made by the department; 4) Bratu appeared and departed from work due to her injury and despite those accommodations; and 5) she requested further accommodations immediately before her discharge.  Other evidence of record described the essential functions of her job.  They included 1) "process[ing] apportioned registration in person, by telephone and through the Texas International Registration Plan online application, 2) "retriev[ing] information from master files, mainframe systems and databases," 3) "enter[ing] information into databases," 4) "research[ing] information from manuals and electronic resources," 5) "attend[ing] work regularly and observ[ing] approved work hours," and 6) "communicat[ing] with and assist[ing] the public, government entities and industry stakeholders in person, by telephone (inbound/outbound), by e-mail and through correspondence."  Through the medical release obtained in late April 2019, the department was informed that Bratu could

---

[2] The *Davis* court further held that the *McDonnell-Douglas* test does not apply to a claim that the employer failed to make a reasonable accommodation.  *Davis*, 188 S.W.3d at 758-59.

not "perform any keyboarding" and her "ability to answer phones" was limited "to only 1-5% of the day."

Being unable to utilize a keyboard or answer phones save for de minimis periods of time, coupled with her continual absence from work, illustrated her inability to perform essential job functions. Those functions she could not perform included maintaining regular attendance, retrieving electronic data, imputing electronic data, researching via electronic means, communicating through email, or communicating through the phone. Thus, the burden fell upon Bratu to offer evidence sufficient to raise a question of fact regarding whether she could perform them with reasonable accommodation. *See Kerr*, 643 S.W.3d at 728 (stating that if the defendant presents evidence negating jurisdiction, the claimant must present supporting evidence regarding the jurisdictional issue); *Mesquite Indep. Sch. Dist. v. Mendoza*, 441 S.W.3d 340, 343 (Tex. App.—Dallas 2013, no pet.) (stating that if the defendant presents evidence negating the claimant's prima facie case, the claimant must present supporting evidence); *see also Posey-Glynn v. Camden Dev., Inc.*, No. 05-19-01454-CV, 2020 Tex. App. LEXIS 9709, at *16 (Tex. App.—Dallas Dec. 10, 2020, no pet.) (mem. op.) (stating that Posey-Glynn "was still required to provide summary judgment evidence sufficient to create a fact issue on whether she was qualified to do the job at the time she was terminated"). That, she did not do.

No one disputes that the department implemented numerous accommodations during the 16 months after Bratu's injury. Nor is her inability to perform each essential function of her job (including regular appearance at work) throughout that 16-month period despite the accommodations in reasonable dispute. Indeed, medical restrictions

5

persisted, as did her absence from work. Furthermore, the latest accommodations sought consisted of processing salvage titles and manning the information desk. Whether those tasks enabled her to perform all essential functions of the job for which she was hired went undeveloped; in other words, she failed to present evidence that they did.[3] This omission is of import because an employer is not required to relieve an employee of any essential functions of the job, modify those functions or duties, reassign other employees to perform those jobs, or hire new employees to perform those functions. *Dep't of Aging & Disability Servs. v. Comer*, No. 04-17-00224-CV, 2018 Tex. App. LEXIS 671, at \*16 (Tex. App.—San Antonio Jan. 24, 2018, no pet.) (mem. op.); *Davis*, 188 S.W.3d at 763. So, logically, if the proposed accommodation consisted of requesting an assignment that excluded those essential functions, the accommodation was not reasonable or one the employer had to provide. *See Barber v. Nabors Drilling U.S.A.*, 130 F.3d 702, 709 (5th Cir. 1997) (stating that an employee does not prove he can perform essential functions through accommodations if the only available accommodation is to relieve the employee of those functions). It means the employee would have to tender evidence illustrating the accommodations sought encompassed the essential functions of the job. Again, Bratu did not do that.

And, assuming *arguendo* that processing salvage titles and sitting at the information desk did encompass them, she cited us to no evidence indicating her physical condition allowed her to perform them while also "attend[ing] work regularly and

---

[3] Indeed, she described how working the information desk would allow her to avoid using the phone. Yet, using the phone was an essential function of her job.

6

observ[ing] approved work hours." Indeed, her last departure from work on February 5, 2019, occurred due to suffering extreme pain while merely at her desk.

Given this, we conclude that Bratu failed to carry her burden to raise questions of fact illustrating a prima facie case of disability discrimination. Thus, the trial court did not err in granting that aspect of the department's plea to the jurisdiction.

### *Discrimination Claims*

Bratu also alleged that she was discharged due to her age and national origin. Unlike claims regarding the accommodation of disabilities, the *McDonnell-Douglas* burden shifting procedure does apply to them. Here, we assume *arguendo* that Bratu met her initial burden. Thus, the burden fell to the department to proffer evidence of a legitimate, nondiscriminatory reason for its decision. *Kerr*, 643 S.W.3d at 729.

The reasons it proffered was Bratu's exhaustion of leave and failure to appear at work to perform the essential functions of her job. On their face, neither implicate age, national origin, or other unlawful discrimination; in short, they were legitimate and nondiscriminatory. Consequently, the pendulum swung back to Bratu to offer evidence showing them to be false or a pretext for discrimination. *City of San Antonio v. Diaz*, No. 07-23-00275-CV, 2024 Tex. App. LEXIS 3343, at *5-6 (Tex. App.—Amarillo May 15, 2024, no pet.) (mem. op.). In other words, Bratu had to offer evidence sufficient to create a question of fact about whether her age or national origin was indeed a motivating factor in the decision to discharge.

That Bratu did not show up for work on April 23rd and had used her leave is clear. Nonetheless, she viewed the proffered reasons as pretext because Wilson and another supervisor conspired to force her to exhaust her leave. As explained by Bratu, she

7

appeared for work on December 5th and was met by the supervisor "who forced her to leave the building." Before doing so, the supervisor apparently asked to see her medical restrictions, noted that she was not released to return to work that day, told her to return to her doctor to see if they could be changed, and walked her to her car. Bratu did not deny being medically restricted from returning to work on that day. Moreover, she saw her doctor immediately after leaving, and he told her not to return. Additionally, Bratu acknowledged during her deposition that Wilson sent her home due to her medical restrictions. And, when asked if she were "saying it was a bad thing that Amber Wilson looked at your medical restrictions and then asked you to comply with them," Bratu answered "[y]es."

The foregoing is not evidence that the department or its representatives directed Bratu to remain gone. Nor is it evidence that the department or its representatives directed her to remain gone with the intent that she exhaust her leave. Per Bratu herself, her doctor refused to alter her restrictions; he directed her to not appear for work.

Furthermore, Bratu cites us to no evidence of her attempting to return to work before February 4th or otherwise being prevented from doing so by anyone with the department. And though she appeared for work both February 4th and the morning of February 5th, she left on the 5th due to pain. That resulted in her doctor again extending restrictions against working through April 15th and then April 23rd. She did not appear on April 23rd though. Instead, her doctor again delayed her return until May and ordered she forego keyboarding and phone use to more than a de minimis extent.

Nothing of record viewed in a light most favorable to Bratu supports her contention that the department forced her to exhaust her leave. And, that she may now subjectively

8

believe her superiors acted with some ill motive towards that end matters not.  Subjective beliefs are not enough.  *Dall. Cty. Hosp. Dist. v. Ballew*, No. 05-22-01358-CV, 2024 Tex. App. LEXIS 2116, at *30 (Tex. App.—Dallas Mar. 26, 2024, no pet.) (mem. op.); *see Tex. Dep't of Aging & Disability Servs. v. Lagunas*, 618 S.W.3d 845, 853 (Tex. App.—El Paso 2020, no pet.) (requiring a plaintiff to do more than utter bare assertions or subjective beliefs that the employer's reasons for its decision were both false and pretextual).

Bratu also attempted to prove the reasons for her termination were pretextual through arguing that the department "falsely accused [her] of 'failing' to show up for work, or a 'refusal' to return to work."  The actual reason given for termination was her "exhaustion of all available leave and ***her inability to return to work and perform her essential job duties***, even with accommodations."  (Emphasis added).  So, Bratu inaccurately represents the department's reason for termination; it was not because of her "failing to show up . . . or a 'refusal' to return to work."  It was her "inability to return" and do her job.

Nor has Bratu cited us to evidence supporting her allegation.  That to which we were directed revealed questions about whether Bratu or her physician modified the date of return appearing on the initial April 2019 medical release.  The document described the return date as April 15, 2019.  The second release tendered by Bratu illustrated that someone manually struck April 15, 2019, and replaced it with April 23, 2019.  According to Bratu, upon one of her supervisors observing this, the individual first asked who made the change and then told Bratu "to stay home because they wanna know, you know, who made the mistake.  They want the doctor to -- to -- to receive something from the doctor to see if the doctor did it or me."  Bratu also admitted to not returning to work on either

9

April 15th or the 23rd. Instead, she revisited her doctor who again extended her leave until the first week of May 2019. Irrespective of whether the tendering of medical releases, which continually postponed Bratu's return date evinced her own desire to eschew work, the evidence does not support a reasonable inference that the department accused her (rightly or wrongly) of refusing to return or work. It merely concluded that she had exhausted her leave and was unable to return and perform the essential functions of the job for which she was hired.

Bratu next posited that the department's "refusal to consider additional reasonable accommodations was additional evidence of pretext." As said earlier, we were cited to no competent evidence suggesting that she was capable of performing all the essential functions of the job for which she was hired. The least of them was to show up regularly for work, and the record evidence clearly illustrated she did not do that. Nor were we cited to competent evidence suggesting the last two accommodations sought (i.e., processing salvage titles and sitting at the information desk) either fell within the ambit of those essential functions or were tasks which she was actually capable of performing. And, her subjective belief that processing salvage titles or sitting at the information desk encompassed all essential functions of her job which she could capably perform is not competent evidence of either. Indeed, we cannot reasonably ignore the undisputed evidence that on the last day she actually worked (i.e., February 5, 2019) her pain required her to leave. Whether she could do any work, therefore, was speculation.

In sum, Bratu directed us to no competent evidence from which a rational juror could infer that the reasons given for her termination were pretext. So, she again failed to carry her burden of proof assigned her by controlling legal authority. That leads us to

10

again conclude the trial court did not err in granting the department's plea to the jurisdiction on Bratu's discrimination claims.

### *Retaliation Claim*

The final claim we address pertains to retaliation. Allegedly, the department fired her because she complained to one supervisor of Wilson's purported mistreatment of her in December 2018. Allegedly, the supervisor and Wilson then became part of the team ultimately determining Bratu's fate five months later. In so arguing, Bratu alluded to the elements of a prima facie case for retaliation. They included causation. That is, the complainant must illustrate a causal link between the protected activity and adverse action. *Alamo Heights Ind. Sch. Dist.*, 544 S.W.3d at 782.

Initially satisfying the causal link is not onerous and may be done through mere comparison of the timing between the protected activity and the adverse action. *Id.* If close in time, then the link may be satisfied. *Id.* Yet, that is not true if the employer provides evidence of a legitimate reason for the adverse action. Then, the employee must present evidence illustrating the action would not have occurred **but for** the protected activity. *Id.; see Ptomey v. Tex. Tech Univ.*, 277 S.W.3d 487, 497 (Tex. App.—Amarillo 2009, pet. denied) (stating that the proper standard of causation for retaliation claims is the traditional but-for measure). As said by our Supreme Court, that nexus is significantly harder to prove. *Alamo Heights Ind. Sch. Dist.*, 544 S.W.3d at 782. And, we focus on it here.

As said earlier, the department proffered legitimate, non-discriminatory reasons for terminating Bratu. Thus, to survive dismissal, she had to proffer evidence sufficient to raise a material question of fact on the element of causation. She had to proffer evidence

11

from which a rational juror could reasonably deduce that but for her complaint about Wilson, she would have retained her job.

Yet, the individual who made the decision to terminate, i.e., Kuntz, averred that he knew not about Bratu's age, national origin, or complaints of discrimination. He further averred that: "I made the decision to administratively separate Ms. Bratu . . . My decision was not based on [her] age, national origin, disability, or any complaints of discrimination. My decision was based on [her] exhaustion of all available leave and her inability to return to work and perform her essential job duties, even with accommodations."

As explained earlier, Bratu did not succeed in establishing a question of fact regarding the supposed pretextual nature of the grounds upon which Kuntz relied. So, they do not serve to show that but for some protected activity, she would have remained employed. *See Alamo Heights Ind. Sch. Dist.*, 544 S.W.3d at 791-92 (considering whether the reasons given for the adverse action were shown to be pretext when applying the but-for causal link).

Nor did Bratu cite us to evidence contradicting Kuntz's statement that he knew not of any complaints about discrimination. *See id.* at 790 (including the decision-maker's knowledge of the protected activity in the litany of circumstances to consider when assessing the but-for nexus); *see also Manning v. Chevron Chem. Co. LLC*, 332 F.3d 874, 883 (5th Cir. 2003) (stating that "to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity"). Instead, she posits that one or more of her supervisors were part of the "team" considering what to do about her. From that, in her view, 1) a "reasonable juror could have concluded" her supervisors "disclosed to the other decision-makers who

12

terminated Bratu that Bratu had reported . . . discriminatory animus . . . in which case the other decision-makers were complicit in the retaliation decision," or 2) the "retaliatory motive" of her supervisors could be "imputed to the other decision-makers under the 'cat's paw' theory the United States Supreme Court has recognized." *See Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) (observing that an employer may be deemed at fault if one of its agents committed an act based on discriminatory animus that caused an adverse employment action).

Regarding the latter and assuming the "agents committed an action based on discriminatory animus," Bratu still had to proffer evidence that the action caused the adverse employment decision. Proof of the supervisors merely being part of the "team" who investigated the circumstances does not suffice. This is so because we are left to speculate not only about what they said or did but also their motivation. We are left to speculate that they somehow nudged Kuntz to act in a way they wanted. Yet, Bratu cites us to no evidence indicating they said or did anything as part of the "team." Indeed, individuals may sit on committees and say or do nothing of consequence the entire time. We are merely left to assume that because they were part of the "team" they said or did anything. And, assumptions are not evidence. *Terry v. State*, 296 S.W.3d 905, 907 (Tex. App.—Amarillo 2009, pet. ref'd).

Nevertheless, Bratu again attempts to fill that void by arguing her supervisors intended Bratu "exhaust her leave rather than work with restrictions" while knowing and intending "she would be fired for it . . . and she was fired for it." Yet, we know that argument to be deficient as explained earlier. Simply put, Bratu's own physician directed her to stay away from the office, not her supervisors. He, not her supervisors, extended

those restrictions through January into February 2019. He, not the supervisors, sent the April 2019 medical release which served to continue her absence from work. So, the supposed machinations alluded to by Bratu were and are not evidence of her supervisors' causing her discharge per *Staub*.

Nor can jurors reasonably conclude Bratu's supervisors "disclosed to the other decision-makers who terminated Bratu that Bratu had reported . . . discriminatory animus." Again, she cites us to no evidence indicating such a report to Kuntz. Nor does mere membership on a team assessing Bratu's circumstances suffice. That would entail assuming the supervisors not only offered Kuntz input but also that the input offered included reference to purported complaints about discrimination. Neither assumptions nor surmises are evidence of missing facts. *Terry, supra*; *USLIFE Title Ins. Co. v. Rossco, Inc.*, 550 S.W.2d 419, 422 (Tex. App.—Eastland 1977, writ ref'd n.r.e.). Speculation, personal belief, or insupportable inferences like that here do not raise questions of fact. *Ptomey*, 277 S.W.3d at 497-98. And, this leads us to conclude that Bratu failed to present evidence sufficient to raise a question of fact on the element causation.

We overrule Bratu's contentions and affirm the order of dismissal.


Brian Quinn
Chief Justice

14