Mack W. TAYLOR, Jr., Plaintiff–Counter Defendant–Appellant,

v.

The PRINCIPAL FINANCIAL GROUP, INC., Defendant–Counter Claimant–Appellee,

Principal Mutual Life Insurance Company, Defendant–Appellee.

Mack W. TAYLOR, Jr., Plaintiff–Appellant Cross–Appellee,

v.

The PRINCIPAL FINANCIAL GROUP, INC.; Principal Mutual Life Insurance Company, Defendants–Appellees Cross–Appellants.

Nos. 95–50291, 95–50455.

United States Court of Appeals, Fifth Circuit.

June 26, 1996.

Rehearing Denied July 25, 1996.

Mark D. Pierce, El Paso, TX, Gil Gonzalez, Law Offices of Gil Gonzalez, El Paso, TX, for Mack W. Taylor, Jr. in both cases.

Douglas Kent Butler, Figari & Davenport, Dallas, TX, for Principal Financial Group, Inc. and Principal Mut. Life Ins. Co. in both cases.

Before POLITZ, Chief Judge, and DeMOSS and DENNIS, Circuit Judges.

DeMOSS, Circuit Judge:

In this Americans with Disabilities Act case, appellant Mack W. Taylor argues that the district court erred in granting his employer summary judgment relief. Holding that appellant failed to offer any summary judgment evidence showing that he apprised his employer of (1) any limitations resulting from his disability, and (2) any need for a reasonable accommodation, we affirm the district court's grant of summary judgment.

## BACKGROUND

Defendants, The Principal Financial Group, Inc. and Principal Mutual Life Insurance Co. ("Principal Mutual"), hired plaintiff, Mack W. Taylor, Jr. ("Taylor"), in September 1990. Taylor became the manager of Principal Mutuals' El Paso, Texas office on January 1, 1992. Taylor's contract defined his duties to include the recruiting, selecting, and training of agents, the managing of agency affairs, the supervising and managing of the agents, brokers, and agency staff, and the maintenance of the policies. Ultimately, it was Taylor's job to lead a productive sales office.

On June 17, 1992, Taylor met with Jerry Carey ("Carey") who was then Taylor's supervisor. At their meeting, Taylor admitted to Carey that Taylor had substituted some fictitious names into certain standardized career profile tests which were given to all new recruits, purportedly to enable Taylor to determine the validity of scores of ethnic candidates. Carey reprimanded Taylor during the meeting and advised him in writing that his actions were unacceptable because they gave the impression of unethical practices. Carey also advised Taylor that his 1992 performance in recruiting agents was down from the previous year, and that Taylor's focus for the balance of 1992 should be the development of full-time agents. Finally, Carey criticized Taylor for not acting timely in his dealings with a disruptive member of Taylor's staff.

On November 10, 1992, Bruce Matthews ("Matthews"), Taylor's new supervisor, met with Taylor in El Paso to discuss Taylor's lack of effective recruiting. During this meeting, Matthews placed Taylor on probation and gave him until June 30, 1993 to recruit additional agents. After the meeting, Matthews sent Taylor the following "letter of understanding":

Thanks for putting together so quickly your [Taylor's] "must do" results for the first six months of 1993. As discussed in your office on November 10, 1992; the lack of effective recruiting over the past two years is unacceptable. Since we can only expect a certain amount of production from the established agents; growth has to come from the development and retention of new agents.

I [Matthews] believe the results you indicate in your plan can be accomplished by June 30, 1993 and are realistic. As we agreed, these results must be completed by June 30, 1993 for you to continue as agency manager in El Paso.

You personally will recruit four 713 agents. Three of the four must still be under contract on 6/30/93. One must be at Level I and have been a 713 for at least two months.

We will look at the progress you are making at the end of the first quarter. If we agree no progress is being made and there is little chance of reaching these goals by 6/30/93; we reserve the right to make a management change sooner than 6/30/93.

Your action plan to accomplish these results is well thought out. I believe you have the talent to not only meet these requirements, but exceed them. We stand ready to help in any way appropriate.

Please acknowledge your understanding of this letter by signing and returning one of the copies to me.

Taylor and Matthews each signed the letter.

By memorandum dated December 21, 1992, Matthews advised his agency managers, including Taylor, to complete their respective "Career Management Annual Appraisals," and schedule their annual appraisal meeting in Des Moines, Iowa. In his self-appraisal, Taylor noted that he "meets requirements" in most categories, but he acknowledged that he is "below requirements" in the categories of "recruiting" and "agent retention." [1]

---

1. As to recruiting, Taylor noted on his self-appraisal: "My expectations were higher for myself last year than I was responsible for producing. I feel this area needs to be given special attention by myself for the coming year. Have capacity and capability for greater results, as well as personal ability to comprehend needs."

As to retention of agents, Taylor noted: "My retention figures were tied along with my recruiting numbers. Have not established sufficient enough base to with stand the winds of change and economic storms of life."

On April 13, 1993, Taylor met with Principal Mutuals' Manager Advisory Council ("PMAC") in Des Moines, Iowa. At this meeting, the parties discussed Taylor's performance at length and in detail. In short, Taylor was informed by the council that certain important aspects of his work had been declining and they needed improvement.

The next day, on April 14, 1993, Taylor met with Matthews for Taylor's annual review. Matthews told Taylor that he was displeased with Taylor's work and that several of his "key result areas" remained below average. In Taylor's own words, Matthews "left no impression that I was ever doing a good job." In response, Taylor told Matthews that he had been diagnosed with bipolar disorder. Specifically, Taylor testified that his dialogue with Matthews, in relevant part, went as follows:

Q. I said—this is where I came out with the accommodation. I said, you know, "Mr. Matthews, Bruce, are you familiar with what bipolarism is?" And he said, "No." And I said, "Well, are you familiar with what is called manic depression?" And he said, "Well, I've heard of it," or something like that. And I said, "Well, I was diagnosed with that and what I'd ask you to do is to talk to the doctors in the Principal, the medical department or the underwriting department, find out some of the—some of the manifestations of this disease. Find out a little bit about it so we can talk about it." I asked for a reduction in my objectives and I asked for a lessening of the pressure.

The conversation ended with the idea that—I don't know when the 14th was. I don't know if it was a Tuesday or a Wednesday. But the conversation ended with the fact that he would check into this and get back to me on Monday.

Q. Okay.

A. That's it.

Q. Did you tell him that you did not think that you could do the job as agency manager because of your diagnosis, or the ailment that led to your diagnosis?

A. No. What I thought I was going up there to do was to advise him of this and ask for his help in it. I mean, that's what I thought was doing by the accommodation—you know, "Help me." I'm finding out that there's some syndromes and manifestations and things that are just, you know, really beyond my control. I need help.

Q. What was Mr. Matthew's response, if you gathered one, when you asked him whether he knew what bipolarism was or what manic depression was?

A. He said he didn't know what bipolarism was. He really didn't know what manic depression was. And I said I'd been diagnosed and he said, "Well, are you all right?" and I said, "Yeah."

Q. And you said what?

A. I said, "Yeah. I guess." And I asked him if he would look at it, look into it to find out about it so we could talk about it, because I needed help.

Q. Did you tell Mr. Matthews that you needed help?

A. ... I don't know that I did. I don't know that I didn't.

Q. Did you suggest—

A. I felt that's what I was asking him for, whether I verbally said it or not. But I don't know if I verbally said it or not.

Q. Well, did you verbally tell him that you were—did you tell him that you were in therapy, that you were being treated?

A. No. . . .

＊　＊　＊　＊　＊　＊

Q. ... My specific question is, for whatever reason, okay, did you tell Mr. Matthews that either your psychologist or your psychiatrist had told you that you couldn't do your job because of your illness?

A. No, sir.

The next day, Taylor sent Matthews an electronic mail ("E–Mail") message dated April 15, 1993, in which he stated:

I THOUGHT AND WORRIED ABOUT OUR CONVERSATION ALL THE WAY HOME LAST NIGHT AND SPENT A GREAT DEAL OF TIME IN MEDITATION AND TRYING TO REALISTICALLY THINK OF WHAT THIS AGENCY CAN DO THIS YEAR.

BRUCE, I HAVE BEEN UNCHARAC-TERISTICALLY NEGATIVE; I GUESS THAT I HAVE ALLOWED THE ECON-OMY AND THE LAST FEW MONTHS TO COLOR MY PERSPECTIVE. IF I AM TO LEAD, THEN I NEED TO LEAD. I HAVE GONE OVER THE FIGURES AND GONE OVER THE FIG-URES AND I MUST ADMIT THAT WHAT I GAVE YOU WERE LOW AND WHEN THE MASK COMES OFF, I GUESS I WAS HOPING TO NEGOTI-ATE, EVEN THOUGH I SAID I WASN'T. IT GOT ME INTO A HECK OF A CORNER.

BRUCE, I BELIEVE THAT WE (THE EL PASO AGENCY AND ME) CAN HAVE A POSITIVE ICC GROWTH THIS YEAR. I BELIEVE THAT WE CAN DO $273000 ICC'S. BETWEEN YOU AND ME I AM STILL GOING FOR $300,000 BUT YOU CAN COUNT ON THE 273. I TOLD YOU THAT I WOULD RECRUIT 7 PEOPLE THIS YEAR BEFORE JUNE 30.

YOU GAVE ME UNTIL JUNE 30TH TO PROVE TO YOU SOME THINGS THAT I AM GOING TO DO AND BRUCE, I AM GOING TO TAKE YOU UP ON THAT I CAN RECRUIT GOOD PEO-PLE FOR THIS AREA DOWN HERE AND THAT THINGS ARE STARTING TO GO OUR WAY.

On June 24–25, 1993, Matthews met with Taylor in El Paso. Matthews offered Taylor a voluntary severance package to be accepted at Taylor's choice. Matthews did not tell Taylor that he was required to accept the severance package, or that he was terminat-ed. In a subsequent telephone conversation, Taylor notified Matthews that Taylor had not decided whether he would sign the severance agreement.

On July 1, 1993, Taylor received from Mat-thews a letter of understanding dated June 29, 1993, advising Taylor that he had an additional six months to meet certain stan-dards in order to continue as agency manag-er of the El Paso office. In relevant part, the letter stated the following:

I wish to share with you the standards which must be met by year end to continue as agency manager in the El Paso Agency. Although you technically met the require-ments of my December, 1992 Letter of Understanding, key performance results in the agency for the 1993 are unsatisfactory.

\* \* \* \* \* \*

These key performance results must be met by December 31, 1993 for you to con-tinue as agency manager:

\* Personally recruit at least three addition-al 01 agents, for a total of seven in 1993 (those recruited by Gilbert Garcia do not count).

\* One of the 01 agents must end the year at Agency Club level and have been a 713 agent for six months.

\* Two of the 01 agents must end the year at Level I and have been 713 agents for four months.

\* Total production from the 01 class must exceed $43,000 ICCs.

\* Total agency production must exceed 4290,000 ICCs.

\* Unit cost must be at or lower than 72 (Excludes agency manager's compensation and BDA payments.)

We will look at the progress you are mak-ing at the end of the third quarter, 1993. If there is little chance of reaching these requirements by 12/31/93; we reserve the right to make a management change soon-er than 12/31/93.

You have the talent to not only meet these requirements, but exceed them. We stand ready to help in any way appropriate.

Please acknowledge your understanding of this letter by signing and returning one of the copies to me.

Taylor neither signed this letter of under-standing, nor otherwise advised Matthews, or anyone else at Principal Mutual, that the matters set forth in the June 29, 1993, letter of understanding were unacceptable.

On July 6, 1993, Taylor was admitted to Sun Towers Medical Center and treated for bipolar disorder type II and anxiety disor-der.[2] He has apparently received follow-up

---

2. Bipolar Disorder is a psychosis involving a mood disorder characterized by swings from ma-

out-patient care since that time.[3] Taylor admits that he has not worked from July 6, 1993, to the present, and that he remains totally disabled. His doctors have not released him to return to work.

## PROCEDURAL HISTORY

This case was originally filed on August 31, 1994, in Texas state court. It was removed to federal district court on September 22, 1994, based upon federal question jurisdiction (Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213) pursuant to 28 U.S.C. 1331. On March 14, 1995, Defendants Principal Mutual moved for summary judgment. On March 30, 1995, the district court heard oral arguments from the parties and granted summary judgment in favor of Defendants. In its written order granting summary judgment, the district court stated the following, in relevant part:

> Principal Mutual became aware of Taylor's bipolar disorder in April of 1993 and therefore was not obligated to make any accommodations prior to that time. Subsequent to April of 1993, Taylor must show that he did make a request for reasonable accommodations. Taylor's deposition, which was submitted as part of Defendant's summary judgment evidence and is not controverted, does not show that Taylor ever requested any accommodation.... Taylor therefore fails to establish a prima facie case of ADA discrimination.

On April 24, 1995, Taylor filed a notice of appeal to this Court.

nia to depression. Mania is characterized by elevated mood and associated behavioral responses. Characteristics of mania are hyperactivity, optimism, flamboyance, loud, pressured speech, garrulousness, distractibility, delusions of grandeur, disorganized behavior pattern, and poor judgment. Depression is characterized by lowered mood state and related behavior. Characteristics of depression are sadness, hopelessness, feelings of guilt and worthlessness, social withdrawal, psychomotor retardation and vegetative somatic symptoms including anorexia, weight loss, and insomnia. The disability experienced from bipolar disorder ranges from mild to severe. ALAN BALSAM, M.D., ALBERT P. ZABIN, DISABILITY HANDBOOK 628–29 (1990).

## STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*, applying the same standard as did the district court. *McDaniel v. Anheuser–Busch, Inc.*, 987 F.2d 298, 301 (5th Cir.1993). We "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986). Summary judgment is appropriate when the summary judgment record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank*, 47 F.3d 1459, 1462 (5th Cir. 1995).

## AMERICAN WITH DISABILITIES ACT

The ADA is a federal antidiscrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities. Americans with Disabilities Act, 29 C.F.R. § 1630, App. (1995).[4]

The ADA expansively prohibits discrimination in employment against persons with a disability, providing that,

3. By letter dated July 6 (presumably 1993), Taylor notified Principal Mutual that he was seeking disability benefits under a group policy which was provided to him by Principal Mutual. Principal Mutual states that, pursuant to Taylor's request, Taylor was paid his benefits. Taylor does not dispute that he was paid.

4. Pursuant to 42 U.S.C. § 12116, the Equal Employment Opportunity Commission is authorized to issue regulations which effectuate the purpose of the ADA.

[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). A "disability" includes, in relevant part,

a physical or mental impairment that substantially limits one or more of the major life activities of such individual. . . .

42 U.S.C. § 12102(2). "Discrimination" includes,

*not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee,* unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

42 U.S.C. § 12112(b)(5)(A) (emphasis added). The ADA defines "Qualified Individual" and "Reasonable Accommodation" as follows:

(8) Qualified individual with a disability

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

(9) Reasonable accommodation

The term "reasonable accommodation" may include—

(A) making existing facilities used by employees readily accessible to and usable by individual with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment of devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111. "Unless expressly stated otherwise, the standards applied in the ADA are not intended to be lesser than the standards applied under the Rehabilitation Act of 1973." 29 C.F.R. 1630.1, App. (1995) (referencing Rehabilitation Act of 1973 § 504, as amended, 29 U.S.C. § 794).

In *Daigle v. Liberty Life Insurance Co.,* we set forth the elements of, and the standard of proof in, ADA cases:

A plaintiff may establish a claim of disability discrimination by presenting direct evidence of discrimination. Alternatively, the indirect method of proof set for Title VII actions in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), may also be utilized. Under the *McDonnell Douglas* analysis, a plaintiff must first make out a prima facie case of discrimination by showing that: (1) he or she suffers from a disability; (2) he or she is qualified for the job; (3) he or she was subject to an adverse employment action; and (4) he or she was replaced by a non-disabled person or was treated less favorably than non-disabled employees.

*Daigle v. Liberty Life Insurance Co.,* 70 F.3d 394, 396 (5th Cir.1995) (internal citations omitted).

## DISCUSSION

Taylor argues that summary judgment was inappropriate because genuine issues of material fact exist as to whether he made a cognizable request for accommodation. Specifically, Taylor argues that the ADA does not require an employee to use any specific words to invoke the employer's duty to provide reasonable accommodation. Taylor argues that, through the following statements which he made to Matthews on April 14,

1993, "it is undisputed" that Taylor disclosed to Principal Mutual that he suffered from bipolar disorder:

1. "I asked Mr. Matthews, specifically, for help."
2. "What I'd ask you to do is to talk to the doctors in the Principal, the medical department or the underwriting department, find out some of the—some of the manifestations of this disease. Find out a little bit about it so we can talk about it."
3. "I asked for a reduction in my objectives."
4. "I asked for a lessening of the pressure."

Taylor argues that his statements to Matthews raise a genuine fact issue as to whether Taylor asked for a reasonable accommodation.

Taylor additionally argues that once he revealed his disability to Matthews, Principal Mutual had an affirmative obligation to make reasonable accommodations. Taylor argues that the burden is upon the employer to present credible summary judgment evidence that a reasonable accommodation is not possible in a particular situation. Taylor says that Principal Mutual presented no such evidence. Taylor argues that we should reverse the district court's order of summary judgment and remand this case for jury trial.

Principal Mutual argues that Taylor's statements to Matthews did not put Principal Mutual on notice that Taylor had a disability which required accommodation. In fact, Principal Mutual argues that Taylor had indicated to Matthews that Taylor was, in fact, "all right." Principal Mutual argues that the claimed physical or mental limitations of an employee's disability must be made known to the employer before an obligation to accom-

modate arises. Principal Mutual argues that "it is not the illness which the employer must accommodate, but rather any limitations or restrictions caused by the illness." Principal Mutual argues that Taylor did not inform Matthews or Principal Mutual of any limitations or restrictions. Nevertheless, Principal Mutual argues that it gave Taylor an accommodation in the form of additional time to meet his requirements. Specifically, Principal Mutual says that they gave Taylor "an additional six months on his probation despite Taylor's failure to satisfy his job requirements." Principal Mutual asserts that, "having reasonably accommodated Taylor, Principal Mutual was not required to do more."

The ultimate issue presented to this Court is whether Taylor presented summary judgment evidence to the district court sufficient to create a genuine issue of material fact as to whether Principal Mutual violated the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq,* by not making reasonable accommodations to a physical or mental limitation suffered by Taylor and known to Principal Mutual. The district court held that Taylor never requested an accommodation and, thus, failed to establish a prima facie case of ADA discrimination. For the following reasons, we affirm.

*Failure to Identify Limitation*

 Under the ADA, an actionable disability means, in relevant part, a physical or mental impairment that substantially limits[5] one or more of the major life activities of an individual.[6] 42 U.S.C. § 12102(2)(A). To prove discrimination, an employee must show that the employer knew of such employee's substantial physical or mental limitation. After thoroughly reviewing the record, we hold that Taylor has failed to adduce summary judgment evidence which would allow a rea-

---

5. "Substantially limits" generally means (1) unable to perform a major life activity that the average person in the general population can perform; or (2) significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average persons in the general population can perform the same major life activity. 29 C.F.R. § 1630.2(j)(1) (1995).

6. Neither the ADA, nor any corresponding regulations, contain an itemized list of specific disabilities which are covered under the Act. "Instead, the ADA simply establishes parameters to guide employers in how to consider, and take into account, the disabling condition involved." 29 C.F.R. § 1630, App. Background (1995).

sonable trier of fact to find that Principal Mutual knew of any limitations arising out of Taylor's alleged impairment.

The only relevant evidence offered by Taylor is his own deposition testimony stating that he told Matthews that he was "diagnosed" with bipolar disorder, and that he wanted Matthews to "investigate" the condition. The evidence does not show that Taylor ever told Matthews that he suffered a *limitation* as a result of his alleged impairment. To the contrary, when Matthews asked Taylor if Taylor was "all right," Taylor told Matthews that he was.

■■■■ For purposes of proving ADA discrimination, it is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability. This distinction is important because the ADA requires employers to reasonably accommodate limitations, not disabilities. "The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." 29 C.F.R. 1630.2(j), App. (1995); 42 U.S.C. § 12112(a)(5)(A) ("[T]he term 'discriminate' includes ... not making reasonable accommodations to the known physical or mental *limitations* of an otherwise qualified individual with a disability....") (emphasis added); 29 C.F.R. 1630.9, App. (1995) ("Employers are obligated to make reasonable accommodations only to the physical or mental *limitations* resulting from the disability that is known to the employer.") (emphasis added).

To illustrate the distinction between a disability and a limitation resulting from a disability, consider the following hypothetical of two hearing-impaired employees: One hearing-impaired employee is an assembly worker who suffers no job limitations as a result of her hearing-impairment disability; she is able to perform the essential functions of her job without accommodation. The other hearing-impaired employee, however, is a telephone operator who, because of her inability to hear, is limited in her ability to perform the essential functions of her job; this disabled employee may require a reasonable accommodation as a result of her impairment. Both employees are disabled, but only one employee is limited by her disability.

■■■■ As noted by the Equal Employment Opportunity Commission ("E.E.O.C.") in its interpretive guide to the ADA, "[s]ome impairments may be disabling for particular individuals but not for others, depending on the stage of the disease or the disorder, the presence of other impairments that combine to make the impairment disabling or any number of other factors." 29 C.F.R. 1630.2(j), App. (1995). Thus, while a given disability may limit one employee (and therefore necessitate a reasonable accommodation), it may not limit another. For this reason, the ADA does not require an employer to assume that an employee with a disability suffers from a limitation. In fact, better public policy dictates the opposite presumption: that disabled employees are not limited in their abilities to adequately perform their jobs. Such a policy is supported by the E.E.O.C.'s interpretive guide: employers "are prohibited from restricting the employment opportunities of qualified individuals with disabilities on the basis of stereotypes and myths about the individual's disability. Rather, the capabilities of qualified individuals must be determined on an individualized, case by case, basis." 29 C.F.R. 1630.5, App. (1995).[7] Accordingly, it is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting therefrom. In the instant case, Taylor failed to adduce any summary judgment evidence showing that he told Principal Mutual that he was limited as a result of his alleged disability.

*Failure to Identify Accommodation*

■■■■ Even if there was summary judgment evidence creating a fact issue as to

---

**7.** *See also, Teahan v. Metro–North Commuter R. Co.,* 951 F.2d 511 (2nd Cir.1991) ("An employer obviously may not assume that because a person has a handicap, he or she is unable to function in a given work context. Although the Act forbids discrimination based on stereotypes, an employer is entitled to make employment decisions based on 'actual attributes of the handicap'.").

whether Taylor had notified Principal Mutual of alleged limitations, Taylor did not tender summary judgment evidence showing that Principal Mutual failed to provide a reasonable accommodation. "In general ... it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed." 29 C.F.R. § 1630.9, App. (1995). Once such a request has been made, "[t]he appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability." 29 C.F.R. § 1630.9, App. (1995). In other words, once an accommodation is properly requested, the responsibility for fashioning a reasonable accommodation is shared between the employee and employer. 29 C.F.R. § 1630.9, App. (1995). Thus, it is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one.[8] If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one.

■ In this case, the summary judgment record shows that Taylor only asked for a reduction in his "objectives," and a lessening of the "pressure." Principal Mutual responded by granting Taylor an additional six months to meet his job objectives. The next day, Taylor sent Matthews an electronic mail letter in which he optimistically indicates that he can meet the job requirements which. were discussed with Matthews. Nowhere in this letter does Taylor mention bipolar disorder, any limitations resulting therefrom, or the need for any specific accommodations. While Taylor did ask for a reduction in his "objectives," and lessening of the "pressure," for the following reasons, under the facts of this case, such a request is too indefinite and ambiguous to constitute a formal request for accommodation under the ADA.

■ Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, as is often the case when mental disabilities are involved, the initial burden rests primarily upon the employee, or his health-care provider, to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations. It simply stands to reason that the employee and his health-care provider are best positioned to know what type of accommodation is appropriate for the employee. When the nature of the disability, resulting limitations, and necessary accommodations are uniquely within the knowledge of the employee and his health-care provider, a disabled employee cannot remain silent and expect his employer to bear the initial burden of identifying the need for, and suggesting, an appropriate accommodation. When dealing in the amorphous world of mental disability, we conclude that health-care providers are best positioned to diagnose an employee's disabilities, limitations, and possible accommodations.[9] In the instant case, Taylor offered no such evidence.[10] Considering the

---

8. *See*, 29 C.F.R. § 1630.9, App. (1995): *"Once* a qualified individual with a disability *has requested* provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation." (emphasis added); *"When* a qualified individual *has requested* a reasonable accommodation to assist in the performance of a job, the employer, using a problem solving approach, should ... [analyze, consult, identify, etc.] ...." (emphasis added).

9. "When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation." 29 C.F.R. § 1630.9, App. (1995).

10. As summary judgment evidence, Taylor offered only the affidavits of Garry L. Feldman,

Ph.D., and Jean R. Joseph–Vanderpool, M.D. Their respective affidavit testimonies consist, in relevant part, of the following identical statement:

> During the course of my treatment of Mr. Taylor, I have become intimately familiar with his medical condition and have acquired an indepth understanding of Mr. Taylor's capacity to deal with all aspects of his life.

> \*　\*　\*　\*　\*　\*

> Although it is my opinion that Mr. Taylor cannot perform all of the functions of his prior position as Agency Manager due to his present disabled condition, it is also my opinion, based on a reasonable degree of medical probability, that, prior to becoming fully disabled on or about the month of July of 1993, Mr. Taylor was able to perform the essential functions of his duties and responsibilities....

discreet nature of Taylor's alleged disability, and the unspecified accommodation which he was seeking, we hold that Taylor failed to adduce summary judgment evidence which would allow a reasonable finder of fact to conclude that Principal Mutual discriminated against Taylor by failing to reasonably accommodate any limitations resulting from his alleged disability.

## CONCLUSION

For the foregoing reasons, the judgment entered by the district court is AFFIRMED.

---

These statements, which constitute the entirety of the affiants' substantive and relevant testimony, are insufficient to create a genuine fact issue for trial. ("[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)). Nowhere in either affidavit does the affiant identify (1) the specific disability; (2) any limitations resulting therefrom, or; (3) any reasonable accommodations required. When an employee's own medical affidavits fail to identify and address these crucial issues, the ADA certainly does not require the employer to bear the burden of doing so.