**Melodie RICHARDS, Plaintiff,**

v.

**AMERICAN AXLE & MANUFACTURING, INC., Defendant.**

**No. 99–CV–71942–DT.**

United States District Court, E.D. Michigan, Southern Division.

Feb. 25, 2000.

---

Glen N. Lenhoff, Flint, MI, for plaintiff.

William C. Schaefer, Troy, MI, for defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This Americans with Disabilities Act action is presently before the Court on Defendant's Motion for Summary Judgment. Plaintiff has responded to Defendant's Motion, to which Response, Defendant has replied. Having reviewed and considered the parties' briefs and supporting documents, and having heard the oral arguments of counsel at the hearing held on February 10, 2000, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

### II. PERTINENT FACTS

Plaintiff Melodie Richards–Auten, (formerly known as Melodie Stange),[1] is a former employee of Defendant American Axle & Manufacturing, Inc. ("American Axle"). Ms. Richards has a physical impairment: a cleft left hand (i.e., she has a hand that essentially has one finger and a thumb). She further does not have a muscle in her left arm that normally would extend underneath her arm into the armpit area, and this limits her ability to rotate her wrist and arm. She claims in this lawsuit that American Axle failed to accommodate her disability and ultimately terminated her employment in violation of the Americans With Disabilities Act (the "ADA").

Ms. Richards began her employment with American Axle on July 21, 1997. Her job classification was that of "temporary associate," and, as such, she was covered by the collective bargaining agreement entered into between American Axle and the UAW. Plaintiff signed an acknowledgment on July 21 acknowledging that, except for certain provisions concerning seniority and employee benefits, all other terms of the collective bargaining agreement applied to her. [See Defendant's Ex. 4.]

Prior to beginning her job, Plaintiff underwent a pre-employment physical. Her hand and arm abnormalities were noted at that time. However, she had no problem lifting and indicated to the medical examiner that she felt "great."

Upon being hired Ms. Richards was assigned to the job of carrier loader on the "9½ carrier" line. In this position, using an air-assisted hoist, Plaintiff would pick up a differential housing (referred to as a "carrier") out of a basket, insert a "J" hook into the carrier, and then press the hoist button which would pick the carrier up out of the basket. Plaintiff would then guide the part along while it was transported via an overhead chain to the conveyor which took it to the next phase of the process.

While employed as a carrier loader, Plaintiff worked on the second shift (i.e., 4:00 p.m. to midnight) under the supervision of Daniel Barrett through the end of 1997. In January 1998, Mr. Barrett transferred to the first shift (i.e., day shift) and Plaintiff's supervisor on the second shift became Tom Guarascio.

Within the first 30 days that Ms. Richards worked on this job, Dan Barrett became aware that she was experiencing some degree of discomfort manipulating the hook into the carrier. To alleviate this discomfort, American Axle arranged to have a special hook fabricated by the com-

---

1. While employed by American Axle, Plaintiff went by the name "Melodie Stange," Stange being the name of her former husband. When she filed this action, Plaintiff had returned to using her maiden name, Melodie Richards. In April 1999, after this lawsuit was filed, Ms. Richards re-married, and now goes by her married name, "Melodie Auten." To be consistent with the caption of this action, when referring to Plaintiff by name, the Court will use "Melodie Richards."

pany's skilled trade employees for her use. The original hook Plaintiff was using was like a long fish hook. The hook fabricated especially for her was shortened and a "T" bar with padding on it was put across the top of the hook so she could more comfortably grab it with her hands and easily guide the hook down to the carrier to catch hold of the part in the basket and press the hoist button to lift it up.

After this special hook was put into place, Barrett testified that he never heard from Plaintiff or anyone else that Richards was experiencing any difficulty with the job due to her disability.[2] Barrett testified that he specifically asked Plaintiff whether the new hook helped and she told him that her hand felt fine. [See Defendant's Ex. 6, Barrett Dep. p. 16.] Barrett's second shift successor, Tom Guarascio, testified that during the brief time that Plaintiff was under his supervision, Plaintiff never complained to him about pain or any difficulty performing her job because of her deformity. [See Defendant's Ex. 7, Guarascio Dep. pp. 15–16.] Alfonso Russell, Barrett's and Guarascio's superior, also testified that Plaintiff did not at any time complain to him that she was having problems doing her job because of her disability.

[See Defendant's Ex. 8, Russell Dep. p. 10.]

As noted *supra*, Plaintiff testified in her deposition that after she was given a special hook to use to perform her job, she continued to have pain in *both* her arms. However, Plaintiff admits that, while she complained about the pain, she never requested any accommodation from any of her supervisors or any one else in American Axle's management. The only person that Plaintiff testified she asked for any "accommodation" from is Joe Lucas. Mr. Lucas is a union representative of the American Axle skilled trade workers. [*See* Plaintiff's Dep. pp. 49–50.] Ms. Richards testified that she told Joe Lucas that she "needed a different job so [she] wouldn't work in such pain." *Id.* at 50. Mr. Lucas, however, is not an American Axle supervisor or manager and has no job assignment or other such personnel-related authority.[3]

Plaintiff's last day worked at American Axle was January 24, 1998. Plaintiff testified that she called in to the plant on January 26, 1998 and informed a day-shift foreman, Tom Jones,[4] that she had been in a car accident on January 25th and had a doctor's excuse to be off work for two weeks.[5] However, Plaintiff admits that

2. Plaintiff testified in her deposition that she complained to Barrett and to co-workers about "aching, throbbing" pain in *both* of her arms. She did not, however, testify that the pain was due to her disability or that she was having difficulty performing her job because of her disability. [See Defendant's Ex. 3, Plaintiff's Dep. pp. 45–50.]

3. After this lawsuit was filed, Plaintiff learned that American Axle may have been able to accommodate her with a change in her job by virtue of a "restricted employee" program designed to assist employees with job restrictions. However, Plaintiff admits that she never knew that this restricted employee program existed at the time that she worked for American Axle, and it appears that the program may, in fact, not been in place at the time. Both Dan Barrett and Tom Guarascio testified that they did not know such a program existed at the time Plaintiff worked under their supervision.

4. Apparently, American Axle job foremen are not supervisory employees. Rather, it ap-

pears that such employees are union employees, and they do not have disciplinary, or hiring/firing authority over the general plant workforce.

5. Plaintiff testified that the procedure for an afternoon shift employee to call in sick was to call the security office and inform the officer on duty that him that she was not coming to work that day. The security officer on duty would either put the call through to the plant or give the employee a "work number" which would be used by the employee to verify that he/she had called in to report being absent. Plaintiff testified that she called the security office on January 26th when she was put through to the plant where she spoke to a day shift foreman. [Plaintiff's Dep. pp. 79–82.] She then added that she called in "every three days from the first day (Monday, January 26, 1998)," but was vague as to any specifics:

"I talked to two different officers, apparently they were doing rotating shifts or something every, I don't know—I can't recall. I

she never spoke to any supervisory or management employee about her car accident or her doctor's note. [Plaintiff's Dep. p. 78.] She further admits that she never sent her doctor's excuse to American Axle. *Id.* Plaintiff testified, however, that she was told by Mr. Jones to bring the note with her when she returned to work, *id.* at 86, adding that she recalled that in connection with a prior, unrelated absence, she had been told to bring in her doctor's note when she reported back to work. *Id.* at 81.

When Plaintiff failed to return to work after three days, and no doctor's note had been provided, on January 28, 1998, in accordance with the American Axle–UAW Collective Bargaining Agreement which governed Plaintiff's employment, her employer sent a certified letter advising her of the possibility of being terminated if she failed to appear for work within five (5) days. [See Defendant's Ex. 10.] When Defendant did not hear from Plaintiff within that time period, her employment with American Axle was terminated effective February 9, 1998.

Plaintiff, however, testified that she did not receive the certified letter until February 17, 1998. (This fact is borne out by the "return receipt" returned to Defendant by the Postal Service. *See* Defendant's Ex. 11.) Nonetheless, the record evidence of this case shows that Plaintiff apparently had no intention of ever returning to her American Axle job. On February 6, 1998, she called her Community Mental Health Services counselor, Drake M. Davis, and informed him that she

> isn't going back to her job and that she will be on a plane headed for Florida by 3 pm and is canceling her appointment. Will discuss details next month or sooner if she has a crisis.

[See Defendant's Ex. 12.] [6]

In any event, Plaintiff admitted in her deposition that she made no attempt to contact American Axle or her union after receiving the certified letter from her employer on February 17. Instead, Plaintiff filed for and ultimately collected unemployment compensation. [Plaintiff's Dep. pp. 86–87.]

After her unemployment compensation benefits were exhausted, in October 1998, Plaintiff took a part-time "on call" food service job with the Vassar Public Schools that pays $6.35 per hour which she still holds today.[7] Plaintiff admitted that since taking the Vassar Public Schools job, she has not actively sought other employment, but added, "[I]f I hear about something, if I am out and about, ... I will go for it." *Id.* at p. 96.

Plaintiff filed a charge of discrimination against American Axle with the Michigan Department of Civil Rights on September 4, 1998. On February 3, 1999, the EEOC

---

cannot sit here and pinpoint exactly [when after January 26th.]"
[Plaintiff's Dep. pp. 82–83.]

She further testified that she was twice given "work numbers," but did not keep the papers she wrote either of the numbers on. *Id.* p. 79. That Plaintiff called in on January 26, 1998 is not disputed. *See* 3–Day Absence Notification, part of Defendant's Ex. 10, wherein Defendant noted on January 28, 1998 that Ms. Richards "called in Mon. 1/26 stated she was [in] a car accident" but that "no doctor's statement [was] brought in." *Id.*

6. Mr. Davis's Community Mental Health Services records of his sessions with Plaintiff also indicate that Plaintiff's car accident may have actually happened a month earlier than January 25, 1998 as she had testified. According to Davis's notes, he saw Plaintiff on January 16, 1998, i.e., 10 days before she called in sick to American Axle, and during that January 16th session, Plaintiff related to Davis that *"last month* (i.e., December 1997), she put her car in a ditch com[ing] home from work & was upside down for a good ½ hour before she could get out." *See* Defendant's Ex. 12. (However, Plaintiff testified in her deposition that she was driving from work on January 25th, lost control of the car, and rolled the car over. *See* Plaintiff's Dep. pp. 75–76. For purposes of this motion, the Court accepts as true Plaintiff's deposition testimony.) Plaintiff also indicated to Davis in that January 16 counseling session that she "hates her job." *Id.*

7. Plaintiff testified that while collecting unemployment, she applied for several jobs.

issued Plaintiff a "right to sue" letter. Accordingly, on March 31, 1999, Plaintiff initiated the instant one-count lawsuit in Wayne County Circuit Court alleging an ADA claim against her former employer, American Axle. American Axle timely removed the action to this Court and now that discovery has closed, moves for summary judgment in its favor.

In its Motion for Summary Judgment, Defendant argues first that Plaintiff has failed to make out a *prima facie* case of disability discrimination. In the alternative, Defendant argues that even if Plaintiff has made out a *prima facie* case, Defendant had a legitimate non-discriminatory reason for the termination of her employment, i.e., her failure to report to work as directed or present a doctor's excuse excusing her absence.

Defendant further argues that insofar as Plaintiff claims that Defendant failed to reasonably accommodate her disability, Plaintiff's request for relief is barred due to her failure to request an accommodation. Last, Defendant argues that Plaintiff's claim for front pay and reinstatement is barred by virtue of the fact that Plaintiff is no longer seeking full-time employment.

## A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[8] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the

---

8. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kane Kane, *Federal Practice & Procedure,* § 2727, at 35 (1996 Supp.).

respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible. *Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding Defendant's Motion for Summary Judgment in this case.

B. *PLAINTIFF HAS FAILED TO MAKE OUT A PRIMA FACIE CASE OF DISCRIMINATION UNDER THE ADA*

■ Under well-established Sixth Circuit law, an individual seeking redress under the ADA for an adverse employment action must show: (1) that she is a disabled person within the meaning of the Act; (2) that she is qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) that she was subject to an adverse employment decision that was made solely because of her disability. *Smith v. Ameritech,* 129 F.3d 857, 866 (6th Cir.1997); *Roush v. Weastec, Inc.,* 96 F.3d 840, 843 (6th Cir.1996).

The ADA definition of "disability" requires a plaintiff to have a condition that substantially limits a major life activity. 42 U.S.C. § 12102(2)(A).[9] Thus, the mere fact that a plaintiff has a recognized "physical or mental impairment" in and of itself is not enough to establish that he has an ADA-cognizable "disability". The plaintiff must also establish that his or her impairment "substantially limits" a "major life activity." *Id.*

The ADA regulations define the term "substantially limits" as meaning "(i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). The Supreme Court has further interpreted the phrase "significantly limits" as requiring a showing of a "considerable" limitation or one that limits a major life activity "to a large degree." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2150, 144 L.Ed.2d 450 (1999).[10]

As more fully developed below, applying the foregoing authorities to the facts as alleged by Plaintiff in this case, the Court finds that Plaintiff is not a "disabled" person within the meaning of the federal statute.

With regard to the major life activity of working—which is the only major life ac-

---

9. The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A).

 Major life activities are defined in the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

10. The ADA regulations further set forth the following factors to be considered in determining whether an individual is substantially limited in a major life activity: (i)[t]he nature and severity of the impairment; (ii)[t]he dura-

tion or expected duration of the impairment; and (iii)[t]he permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2). *See also, Roush v. Weastec, Inc.,* 96 F.3d 840, 843 (6th Cir.1996). Further, the Supreme Court has ruled that in determining whether an individual is substantially limited by an impairment that affects a major life activity, the plaintiff is to be evaluated in his or her medicated state. *Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 2137, 144 L.Ed.2d 484 (1999); *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2146, 144 L.Ed.2d 450 (1999). *See also, Gilday v. Mecosta County,* 124 F.3d 760, 767 (6th Cir.1997).

tivity put at issue in Plaintiff's Complaint—the term "substantially limits" means:

significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and ability. *The inability to perform a single, particular job does* **not** *constitute a substantial limitation in the major life activity of working.*

29 C.F.R. § 1630.2(j)(3)(i) (emphasis added). *See also, Sutton v. United Air Lines, supra* ("When the major life activity under consideration is that of working, the statutory phrase 'ubstantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." 119 S.Ct. at 2150); *Welsh v. City of Tulsa,* 977 F.2d 1415, 1417 (10th Cir.1992) (being substantially limited in the major life activity of working does not mean working at a job of one's choice).

The regulations further instruct that to determine whether a plaintiff is substantially limited in the major life activity of working, a court may consider:

the number of types of jobs utilizing similar training, knowledge, skills or abilities, within the [plaintiff's] geographic area from which the individual is also disqualified because of the impairment (class of jobs).

29 C.F.R. § 1630.2(j)(3)(ii)(B). The court may also consider:

the numbers and types of other jobs *not* utilizing similar training, knowledge, skills or abilities, within that geographic area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii)(C) (emphasis added).

Consistent with the foregoing, courts have concluded that the major life activity of working is not substantially limited simply because an employee's physical or psychological impairment prevents him from performing a particular job. *See Sutton v. United Air Lines, supra* (plaintiffs' severe myopia only prevented them from working as global airline pilots); *McKay v. Toyota Motor Manufacturing U.S.A., Inc.,* 110 F.3d 369, 373 (6th Cir.1997) (plaintiff's carpal tunnel syndrome which only prevented her from performing a narrow range of assembly line jobs held not to be an impairment that substantially limited her ability to work, in general); *Jasany v. United States Postal Service,* 755 F.2d 1244, 1250 (6th Cir.1985) (where plaintiff's eye impairment, although a permanent one which prevented him from performing the functions of a Postal Service Distribution Clerk, did not interfere with his ability to work in other jobs, he was not substantially limited in the life activity of working); *Wooten v. Farmland Foods,* 58 F.3d 382, 383 (8th Cir.1995) (finding impairment of the plaintiff's hand which interfered with the ability to perform a narrow range of meat packing jobs was not a substantially limiting major life function); *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723 (5th Cir. 1995) (plaintiff who lost use of her right arm due to a gun accident was not substantially limited in the life activity of working where she failed to show that her impairment disqualified from other jobs requiring similar training); *Redlich v. Albany Law School of Union University,* 899 F.Supp. 100 (N.D.N.Y.1995) (plaintiff who suffered a stroke and lost the use of his left leg, arm and hand did not have an ADA-cognizable "disability" where he still could work a number of positions within the class of job in which he was engaged); *Sorensen v. University of Utah Hospital,* 194 F.3d 1084 (10th Cir.1999) (although plaintiff with multiple sclerosis had a cognizable physical impairment, she was not disabled under the ADA where her disability did not disqualify her from performing other jobs for which she qualified by virtue of her education and training.)

■ The foregoing authorities make clear that the mere fact that Plaintiff has an obvious physical impairment is not sufficient to establish that she is "disabled" under the ADA. As the Second Circuit

explained in *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867 (2nd Cir.1998),

> Although almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled.

*Id.* at 870.

Here, Plaintiff has only shown, at best, an inability to perform a single job for one particular employer. Further, Plaintiff's work history belies any argument of being substantially impaired in the life activity of working. Prior to her employment at American Axle, Plaintiff worked for 13 years at a variety of jobs. These jobs included stocking shelves in a supermarket, managing a 136–unit apartment complex, and working in the food service department of a public school system. Since her discharge from American Axle, Plaintiff has obtained another position in the food service industry and apparently has had no problem with her new job as she has held that position now for approximately a year and a half.

Thus, although there is no dispute that Plaintiff has a "physical impairment," she has failed to establish that her physical impairment substantially limits her in the life activity of working and, therefore, she has failed to establish that she is a "disabled person" within the meaning of the ADA.

■ At the hearing on this matter, Plaintiff's counsel attempted to shift the focus of her disability claim by arguing that Plaintiff is also substantially limited in the major life activity of caring for herself.[11] However, there is no evidence of record in this case to support this contention. To the contrary, by Plaintiff's own deposition testimony, her impairment has not substantially limited her in caring for herself. Plaintiff testified that she graduated from high school and went to community college where she pursued a course of study in nursing. She did not complete her nurse's training because she got married and had a child. She spent the next ten years as a homemaker. While Plaintiff did testify that there are some things she can do only with her good hand—e.g., carry a brief case or a twelve pack of soda pop packaged in a sharp-edged plastic carrier—she also testified that she can generally lift and carry most objects and has some degree of manual dexterity in her cleft hand.

Furthermore, as indicated above, Plaintiff worked at a number of jobs during her lifetime including food service jobs where she did "kitchen work," preparing and serving food, washing and drying pots and pans, and cleaning counters. Throughout her tenure at American Axle, Plaintiff drove herself to and from work, while maintaining a home for her and her husband. Simply stated, although Plaintiff undeniably does suffer some limitation in her ability to carry out day-to-day activities in caring for herself, this does not meet the standard established by the Supreme Court in *Sutton v. United Air Lines, Inc.*, which requires a showing of a "considerable" limitation that limits a major life activity "to a large degree." 119 S.Ct. at 2150. Therefore, there is nothing of record which would establish that Plaintiff is substantially limited in the life activity of caring for herself.

Having failed to establish that her impairment substantially limited her in a major life activity, Plaintiff has not established that she is a disabled person within the meaning of the Americans With Disabilities Act. Accordingly, the Court finds

11. As noted *supra,* Plaintiff's Complaint focused only on the issue of Plaintiff's disability as it related to her work. Because the "disability" issue had not been thoroughly addressed by the parties' in their briefs, prior to the hearing, the Court issued a Notice to Counsel advising them that, in addition to the issues raised their briefs, they should be prepared to discuss the issue of whether Plaintiff has an ADA cognizable "disability" as that term has been defined by the statute, regulations, and case law. Apparently aware of the weakness of her "life activity of working" disability argument, Plaintiff argued at the hearing that Plaintiff is also substantially limited in the life activity of caring for herself.

that Plaintiff has failed to make out a *prima facie* case of discriminatory discharge under the ADA.[12]

## C. TO THE EXTENT THAT PLAINTIFF IS ALLEGING A "FAILURE TO ACCOMMODATE" CLAIM, THAT CLAIM IS BARRED DUE TO HER FAILURE TO REQUEST AN ACCOMMODATION

■ The term "discriminate" under the ADA includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. 42 U.S.C. § 12112(b)(5)(A). The Sixth Circuit has determined that in order to bring a claim for failure to accommodate under the ADA, the plaintiff has the initial burden of requesting an accommodation. As the court found in *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042 (6th Cir.1998),

> There is no question that the EEOC has placed the initial burden of requesting an accommodation on the employee. The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation.

*Id.* at 1046–47 (footnote omitted). *See also, Hammon v. D.H.L. Airways, Inc.*, 165 F.3d 441, 450 (6th Cir.1999).

■ In this case, Plaintiff testified that the only person she told that she wanted a transfer to a different job (which presumably is the "accommodation" she wanted) was Joe Lucas who has nothing to do with American Axle management; Lucas is not a manager or a supervisor. Rather, Mr. Lucas is a union representative, who by Plaintiff's own admission, handles representation of the skilled trade union members, and Plaintiff is not a "skilled trades" employee.

■ With regard to her discussions with her supervisor, Dan Barrett, Plaintiff only testified that she complained about pain *in both her arms*. There is no evidence of record to support Plaintiff's claim that she asked anyone in management or a supervisory capacity for an accommodation for her cleft left hand.

Although Plaintiff when initially questioned on this issue at her deposition, Plaintiff stated that she had asked two people for an accommodation—Joe Lucas, the skilled trades union representative, and her supervisor, Dan Barrett—further examination revealed that Plaintiff never asked Barrett for any accommodation, rather she only complained to Barrett of generalized pain in her arms. Plaintiff's testimony regarding her discussions with Barrett was as follows:

**12.** Defendant has argued that Plaintiff has not made out a *prima facie* of ADA discrimination in her discharge because she has not established or even alleged that she was replaced by a non-disabled person. This argument, of course, assumes that the Court would initially find that Plaintiff is "disabled" within the Act. Defendant's argument is rendered moot by the Court's determination that Plaintiff is *not* "disabled" under the ADA.

However, the Court does agree with Defendant that even assuming *arguendo* that Plaintiff were determined to be disabled under the ADA, her failure to establish that she was replaced by a non-disabled person would be fatal to her claim. *See Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 882 (6th Cir. 1996), in which the court, relying upon the *McDonnell Douglas* framework, found that *prima facie* claim of ADA disability discrimination is established if the plaintiff proves that (1) she was "disabled" within the mean-

ing of the Act; (2) she was qualified for the position, with or without accommodation; (3) she suffered an adverse employment decision with regard to the position in question; and (4) a non-disabled person replaced her or was selected for the position that the disabled person sought.

Plaintiff does not dispute that she has not established that she was replaced by a non-disabled person but contends that if the Court would re-open discovery, it is likely that she would be able to make that showing. The Court declines to do so. It is well-settled that the burden is upon the employment discrimination plaintiff to make out a *prima facie* case of discrimination. Plaintiff had more than ample opportunity to establish her claim during the six months she had to conduct discovery in this case. A single interrogatory question would have provided Plaintiff with the means to establish satisfaction of the fourth element of a *prima facie* case.

Q: ... I want to know ... what it is that you said, that you claim to have said to Mr. Barrett in January of 1998 about your job and any request for accommodations that you had.

A: I said I needed to do—or I couldn't—I was having difficulty with my job because of the pain. He didn't say I will accommodate you. . . .

\* \* \* \* \* \*

Q: *Your testimony is that you said to Mr. Barrett, I am having difficulty doing my job because of the pain in my arms?*

A: *Yes.*

Q: When did you say that to him?

A: Either the first of the year or at the end of December.

\* \* \* \* \* \*

Q: *Did you say anything else to Mr. Barrett other than that?*

A: *Not that I recall.*

\* \* \* \* \* \*

Q: ... You mentioned that there was a J hook that had a T across the top. *Did you ask for* or did you receive *any other accommodations on that job other than that?*

A: *Not that I can recall.*

Plaintiff's Dep. pp. 57–59.

 Plaintiff's complaints about pain in her arms are not tantamount to a request for an accommodation. As noted in *Gantt, supra,* the Defendant is not required to speculate as to the need or desire for an accommodation. Where a plaintiff does nothing more than complain of having difficulties with his or her job, but never tells to the employer that those difficulties stem from a condition of disability, no claim of failure to accommodate will lie. *Hammon v. D.H.L. Airways, Inc., supra. See also, Curry v. Empire Berol, U.S.A.,* 134 F.3d 370, 1998 WL 13407 (6th Cir.1998), in which the court found no duty to accommodate the plaintiff because he had not requested any accommodation where he only requested to leave work "because he was sick," not that he was sick due to his heart problems. 1998 WL 13407 at *4.

As the Fifth Circuit explained in *Taylor v. Principal Financial Group, Inc.,* 93 F.3d 155 (5th Cir.1996), *cert. denied,* 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996):

> ... once an accommodation is properly requested, the responsibility for fashioning a reasonable accommodation is shared between the employee and employer. Thus, it is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one. *If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one.*

93 F.3d at 165 (footnote omitted; emphasis added.)

Since Plaintiff failed to request an accommodation from her employer, her "failure to accommodate" claim must be dismissed.

D. *PLAINTIFF HAS FAILED TO ESTABLISH ANY NEXUS BETWEEN HER DISABILITY AND HER DISCHARGE*

The third element of a *prima facie* ADA discriminatory discharge case requires the Plaintiff to establish that she was subject to an adverse employment decision "solely because of her disability." *Smith v. Ameritech, supra; Roush v. Weastec, Inc., supra.* Plaintiff has failed to make this showing.

Plaintiff's employment at American Axle was terminated because of her failure to report to work for three consecutive days without contacting a member of Defendant's management. Pursuant to the collective bargaining agreement, Defendant mailed a notification to Plaintiff informing her of possible termination if she failed to report to work within five days and did not give a satisfactory reason for her absence.

Although Plaintiff did not receive that warning notice until February 17, 1997, i.e., nearly a week after the reporting cut-off date, she did not do anything upon receiving the notice to explain her situation to her employer or seek to be reinstated.[13] Although Plaintiff has presented a minor factual dispute as to whether or not she called in more than the one time recorded by Defendant on January 26, 1998 and whether she should have been permitted, under either her collective bargaining agreement or plant practice, to simply bring her doctor's note in when she returned to work, there is nothing in any of the foregoing which even tends to remotely suggest that any of Defendant's actions with respect to the termination of Plaintiff's employment were taken because of, let alone solely because of, Plaintiff's physical impairment.[14]

Being unable to establish any nexus between her disability and the termination of her employment, Plaintiff has failed to establish the third element of a *prima facie* claim of discriminatory discharge in violation of the ADA.

E. *PLAINTIFF HAS FAILED TO ESTABLISH THAT THE REASON PROFFERED BY DEFENDANT FOR HER DISCHARGE IS PRETEXTUAL*

■ Even if the Court were persuaded that Plaintiff has sufficiently made out a *prima facie* case of discrimination under the ADA, Defendant has articulated a legitimate non-discriminatory reason for terminating Plaintiff's employment, i.e., her failure to report to work for three consecutive days without contacting a member of Defendant's management. Pursuant to the collective bargaining agreement, Defendant mailed a notification to Plaintiff informing her of possible termination if she failed to report to work within five days and did not give a satisfactory reason for her absence. When Plaintiff did not report to work or otherwise notify her employer to give any kind of explanation for her failure to report, her employment was terminated pursuant to the terms of the collective bargaining agreement which governed Plaintiff's employment.

■ Defendant having articulated a legitimate non-discriminatory reason for its action, the burden is upon Plaintiff to prove "by a preponderance of the evidence" that the Defendant's proffered reasons were not its true reasons but were merely a pretext for illegal discrimination. *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 883 (6th Cir.1996). An ADA plaintiff can establish pretext by showing by a preponderance of evidence either (1) that the asserted reason had no basis in fact, (2) that the reasons given by the employer did not in fact motivate the discharge or (3) if they were factors in the decision, they were insufficient to motivate the discharge. *Id.* At all times the plaintiff bears the burden of establishing that illegal discrimination took place. *Id.*

Plaintiff has not met this burden. Plaintiff attempts to make out a "no basis in fact" argument contending that Plaintiff's indication on the notification of discharge listed the applicable "reason code" as "D05" which the form indicates as

---

13. As noted, Plaintiff was covered by the terms of a collective bargaining agreement and entitled to avail herself of the grievance procedures provided therein. Plaintiff, however, did not file a grievance or otherwise seek the intercession of her union with regard to her discharge.

14. Furthermore, by Plaintiff's own testimony and the record evidence she has presented in this matter, Plaintiff's doctor gave her an excuse on January 26, 1997 to be off work for two weeks. Accepting the fact that Plaintiff did not receive her employer's termination notice until February 17, 1997, Plaintiff should have reported for work before that date i.e., two weeks after January 26th, on February 9th (a week before she signed for the February 17th certified letter from her employer) when her alleged period of excuse absence ended. She never did so and has never presented any evidence, nor even alleged, that her doctor extended her "off work" instructions beyond the two weeks stated in his January 26, 1997 note.

"Discharge—unsatisfactory temporary employee". [See Plaintiff's Ex. 10.] Plaintiff argues that since her on-the-job performance was always deemed satisfactory, there is no basis in fact for her being terminated for being an unsatisfactory employee. Plaintiff's supervisor, Dan Barrett however, testified that the D05 category "unsatisfactory employee" is used in all cases of unsatisfactory employee action, including attendance problems and "no shows." Although Plaintiff contends that her termination should have been "D08—discharge—other reasons," Dan Barrett testified that that category was never used by him during his tenure as a supervisor and in any event, a "failure to report" is deemed to be unsatisfactory employee conduct. Plaintiff has not presented any evidence to contradict Barrett's testimony, and, in any event, Plaintiff has completely failed to show that illegal discrimination took place.

Plaintiff having presented no evidence of discriminatory pretext, Defendant would be entitled to summary judgment even if the Court were to find that she made out a *prima facie* case.

For the foregoing reasons, the Court finds that Defendant is entitled to summary judgment and Plaintiff's Complaint, accordingly, will be dismissed in its entirety.[15]

### CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be, and hereby is, GRANTED. Accordingly,

IT IS FURTHER ORDERED that Plaintiff's Complaint be DISMISSED in its entirety, with prejudice.

Let Judgment be entered accordingly.

15. The court's determination that Defendant is entitled to summary judgement and dismissal of Plaintiff's Complaint in its entirety

### *JUDGMENT*

The Court having this date entered an Opinion and Order granting Defendant's Motion for Summary Judgment and dismissing Plaintiff's Complaint, in its entirety, and being fully advised in the premises,

NOW, THEREFORE,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that a JUDGMENT OF DISMISSAL with prejudice be, and hereby is, entered.

renders Defendant's additional argument that Plaintiff is not entitled to front pay and reinstatement moot.